**PETER JOHNSON CSB#165523**
**LAW OFFICE OF JOHNSON & JOHNSON**
319 Railroad Ave., Ste. 201
Pittsburg, California 94565
T: (925) 432-7447 F: (925) 473.0512
E: jjlaw2@earthlink.net

**ROBERT R. POWELL, ESQ.  CSB#159747**
**LAW OFFICES OF ROBERT R. POWELL**
925 West Hedding Street
San Jose, California  95126
T: 408-553-0200 F: 408-553-0203
E: rpowell@rrpassociates.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| TRACY WATS0N, RENEE STALKER, PAM STALKER as Guardian Ad Litem for O.S., S.W., and R.W., minors, | Case No. C06-4029 RMW |
| Plaintiffs, | **FIFTH AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS** |
| v. | |
| COUNTY OF SANTA CLARA,  SANTA CLARA VALLEY MEDICAL CENTER; EVERGREEN SCHOOL DISTRICT; CITY OF SAN JOSE, NORMA SPARKS, LINDA BAUM, SHARON BURGAN, JEWELS RAMIREZ, YAZMINA LETONA, LINDA CASTALDI, VU TRAN, RIMA SINGH, AARON WEST, ROSE REAL, ROBERT PRUITT, GARY KISHIMOTO, CHERYL HARMS, CLAUDIA BLODGETT, JOHN HAMILTON, ANITA NOBLE, JANET KAHLE, MARY RITTER, DAVID KERNS, WILLIAM HOYT, CRAIG BLANK, | DEMAND FOR JURY |
| Defendants. | |

# I. JURISDICTION and VENUE

1.     This action is brought pursuant to Title 42 U.S.C. Section 1983, 1985, and Section 1988, Title II ADA 42 U.S.C. 12131 et seq., 504 Rehabilitation Act 29 U.S.C. 794, and contains claims for relief related to violations of Due Process, rights of privacy, association, and the rights of familial association under the 1st, 4th, and 14th Amendments of the U.S. Constitution, and such other statutory and regulatory enactments as herein below stated.

2.     Jurisdiction is conferred on this Court by 28 U.S.C. Section 1343 (3) and 1343 (4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. 1983.  Jurisdiction is also conferred by 28 U.S.C. 1331 (a) because claims for relief derive from the United States Constitution and the laws of the United States.

3.      This Court has supplemental jurisdiction over plaintiffs' state law causes of action pursuant to 28 U.S.C. Section 1367(a).

4.     This complaint is being filed in the San Jose Division for the United States District Court, Northern District of California, pursuant to the Local Rules of the Northern District Court, due to the fact the events complained of herein occurred in Santa Clara County and the parties herein are located and/or reside in Santa Clara County.

5.     Plaintiffs have made timely claims under the California Tort Claim act to each of the public entities herein regarding such public entity liability and such public employee liability under California state law as alleged herein, as required pursuant to California law (G.C. 900, et seq).  The Claims have all been denied.  Plaintiffs hereby file this suit and/or the original and/or amended complaint in this action, as applicable, within the statutory time following rejection of said claims.

6.     Additionally, and with regard to any and all defendants within the definition of "health care providers" named herein, all such persons or entities have been provided notice of intent to sue per the tort claim referenced above, to the extent that conduct they engaged in related to the complaints of plaintiffs herein, if any, is covered under the provisions of MICRA.

## II. PARTIES

7.     Plaintiff RENEE STALKER ("RENEE") is an adult individual and the mother of minor plaintiffs, O.S., S.W. and R.W.  RENEE is the wife of plaintiff TRACY WATSON ("TRACY").

8.     Plaintiff TRACY is an adult individual and the father of minor plaintiffs O.S., S.W. and R.W.  Collectively, the parents and children are referred to herein from time to time as the "Watson family."

9.     At all times relevant hereto, except as related to the circumstance of the family's move to Napa County in June of 2006, the adult plaintiffs and their minor children resided in Santa Clara County, California.

10.     O.S. was, at the commencement of the circumstances complained of herein, an 8 year old female child.  She is qualified as "disabled" as it is defined under federal and California state law and as related to academic and educational programs, as an "exceptional needs" child as same is defined under California state law.  O.S. suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), Tourettes Syndrome, Sensory Integration Disorder, Processing Deficits, and has deficits in communications skills, cognitive skills, chronology, and memory impairment.

11.     S.W. was, at the commencement of the circumstances complained of herein, a 4 year old male child who suffers from Severe Autism, is qualified as "disabled" as it is defined

under federal and California state law and as related to academic and educational programs and the obligations of school districts and employees to make accommodations in the education of children within said qualification, and S.W is also an "exceptional needs" child as such is defined under California state educational and disability law.

12.   R.W. was, at the commencement of the circumstances complained of herein, a 2 year old male child with no known disabilities.

13.   Guardian Ad Litem PAM STALKER ("PAM") is the great aunt of the minor plaintiffs herein, and has previously been appointed as Guardian Ad Litem for the minor plaintiffs in this matter.

14.   PAM was also the relative with whom the minor plaintiffs were placed for a period of time during the juvenile proceedings as described herein below.

15.   Defendant COUNTY OF SANTA CLARA (hereafter "COUNTY) is a municipality, organized and operating under the laws of California, and has as governmental agencies organized and existing pursuant to the law and policies of defendant COUNTY, the following departments and/or subunits thereof; OFFICE OF THE COUNTY COUNSEL ("COUNTY COUNSEL"), DISTRICT ATTORNEY'S OFFICE ("DA"), SOCIAL SERVICES AGENCY ("SSA"),DEPARTMENT OF FAMILY & CHILDREN'S SERVICES ("DFCS"), CHILD PROTECTIVE SERVICES ("CPS"), and the VALLEY MEDICAL CENTER ("VALLEY"). "DFCS" and "CPS" are used interchangeably herein, the latter being a sub-unit of the former.

16.   VALLEY is a COUNTY owned and operated community hospital, licensed by the State of California.  VALLEY, and the individually named VALLEY employee-defendants named herein below, have undertaken a complex and deeply intertwined process of investigating and evaluating cases of possible child abuse, and the testing, assessment, and evaluation of

medical forensic evidence necessary to present the COUNTY's arguments for the existence of suspected child abuse, be it physical, emotional, or sexual, and assisting thereby in the COUNTY's prosecution of juvenile dependency proceedings to remove and continue the detention of children, and potentially terminate parents' rights to their children. In addition VALLEY solicits and performs services as a private clinical lab.

17.    VALLEY has been designated by COUNTY under Penal Code section 13823.9, subdivision (b) as the COUNTY hospital in which personnel trained to examine sexual assault victims are present or on call to perform such services.

18.    DA is also an organization with a complex, intertwined, and interdependent relationship with DFCS and/or COUNTY, which works in close cooperation with DFCS and DFCS social workers, such as those individually named defendant social workers herein, to jointly prevail in prosecutions against parents in juvenile dependency proceedings and any criminal prosecutions related to the underlying facts or circumstances which have brought a family to the attention of DFCS or DA.

19.    Plaintiffs are informed and believe, and upon such information and belief herein allege, that the relationship between these entities (DFCS and DA) is such that they regularly share information about the parents and children which is subject to confidentiality under either the Penal Code of the State of California or the Welfare & Institutions Code of the State of California, without regard for the laws on confidentiality, and in contravention of standing orders of the Juvenile Court in Santa Clara County prohibiting the dissemination of certain types of information – particularly documents and information related to juvenile court proceedings - between the agencies.

20. COUNTY COUNSEL of COUNTY represents both DA and VALLEY in legal matters, and claims attorney-client privilege for all communications otherwise discoverable by plaintiffs in civil actions against such entities, where such communications are amongst and between VALLEY and/or DA personnel and COUNTY COUNSEL, even if VALLEY personnel are intended to be called as expert witnesses in a case.

21. COUNTY either intentionally or negligently, whether as a result of policies, practices, customs, or procedures, or as a result of ineffective, non-existent, or inadequate training and education of employees, caused or were otherwise responsible for the acts or omissions of said employees as complained of herein. Plaintiffs allege that the policies, practices, customs, and/or procedures of COUNTY, as determined and effected in the circumstances complained of herein by the named defendants against the individual plaintiffs, constitute and/or engender a circumstance and/or environment of deliberate indifference to the rights and safety of citizens of the community, of families, and of children.

22. The entities are referred to interchangeably herein as COUNTY unless the context of the reference is specific to an individual entity. All defendant-employees of COUNTY, and of the CITY OF SAN JOSE, as set forth herein and unless otherwise specified, are alleged to been operating under color of law at the dates and times, and in performing the acts or allowing the omissions to act complained of herein.

23. Defendant RIMA SINGH is employed by COUNTY COUNSEL as an attorney assigned to prosecute juvenile dependency proceedings in the Santa Clara County Superior Court, and at all times relevant herein to the complaints of plaintiffs, was the lead attorney in the prosecution of a juvenile proceeding involving the Watson family, prosecuted in the names of the minor plaintiffs herein.

24.     Defendant AARON WEST is employed by the DA as an attorney who accepts appointments under a contract between DA and COUNTY for the provision of legal representation of minor children involved in juvenile dependency proceedings, and was at all times complained of herein by plaintiffs, the attorney appointed to represent the minor plaintiffs in juvenile dependency proceedings in the Santa Clara County Superior Court.

25.     In contracting with the DA office of COUNTY, plaintiffs are informed and believe that the DA on behalf of the COUNTY executes a nefarious policy, practice, custom, and/or procedure whereby the District Attorneys, such as AARON WEST, who are appointed to represent minors in the juvenile dependency court, do not provide independent and zealous representation within the bounds of the law for the minors they represent, as is required of any attorney practicing law in the State of California.

26.     Instead of providing independent and zealous representation of minors, the counsel appointed from the office of the DA, and particularly WEST in the juvenile proceedings in which she is appointed, such as the juvenile proceedings involving the Watson family herein, operate as indistinct and undifferentiated advocates of the position of COUNTY COUNSEL and DFCS, and, 1.) do not independently investigate the facts and circumstances that have brought the children into or within the juvenile dependency system as required under the lawful conditions of their statutory appointment (Welfare & Institutions Code Section 317), 2.) do not obtain and inform the court of the wishes of children who wish to be returned to their parents or parent, 3.) routinely accept appointment at the initial detention hearing and "submit" on the allegations of fact submitted by COUNTY and/or DFCS without having so much as met their young clients, much less actually spoken to them to ascertain their wishes, opinions, thoughts, or version of the events alleged by COUNTY and/or DFCS, 4.) rarely, if

ever, actually speak to the parents against whom allegations have been brought as part of the independent investigation they are supposed to perform pursuant to W&IC 317(e).

27.     Counsel appointed from the DA office, such as WEST, have not ever once during the entire time they have been contracting with the COUNTY, requested a prima facie hearing pursuant to Welfare & Institutions Code Section 321, in order to seek the quickest legal return of the children to a parent or parents, nor ever, with the possible exception of one time in all the years under contracted with COUNTY to represent children in juvenile proceedings, advocated at a jurisdiction trial in a juvenile dependency proceeding against the proposition of the court having jurisdiction over the children.

28.     AARON WEST conducts herself in the manner aforesaid when appointed to represent children in juvenile proceedings, and engaged in each of the actions and/or failures to act noted above in her representation of these minor plaintiffs in their juvenile proceedings as described in this complaint.  AARON WEST has never advocated in a juvenile dependency jurisdiction trial for the position that the juvenile court should not take jurisdiction over a child and/or children.

29.     Defendant NORMA SPARKS is an executive officer within the Social Services Agency and/or DFCS, and employed by COUNTY, with CASTALDI as an employee within her immediate supervisory control.

30.     Defendant LINDA CASTALDI is employed as a Director within the Social Services Agency and/or DFCS, and employed by COUNTY, with BURGAN as an employee within her immediate supervisory control.

31.   Defendant SHARON BURGAN is a social worker employed by the Santa Clara County Department of Family and Children Services, and a supervisor with LETONA as an employee within her immediate supervisory control.

32.   Defendant JEWELS RAMIREZ is a social worker employed by the Santa Clara County Department of Family and Children Services.

33.   Defendant CINDY THOMPSON is a social worker employed by the Santa Clara County Department of Family and Children Services.

34.   Defendant YAZMINA LETONA is a social worker employed by the Santa Clara County Department of Family and Children Services.

35.   Defendant VU TRAN is a social worker employed by the Santa Clara County Department of Family and Children Services.

36.   Defendant LINDA BAUM is a social worker employed by the Santa Clara County Department of Family and Children Services

37.   Defendant Dr. JOHN HAMILTON is a licensed California physician employed by the Santa Clara Valley Medical Center, a Santa Clara County organized and administered medical facility, and the laboratory director for hospital.  HAMILTON is sued in his individual and official capacity, and was at all times herein mentioned working in either his individual capacity, or under color of law as a state actor employed by COUNTY.

38.   Defendant ANITA NOBLE is employed by VALLEY, and is sued in her individual and/or official capacity.

39.   Defendant JANET KAHLE is employed by VALLEY, and is sued in her individual and/or official capacity.

40.    Defendant MARY RITER is employed by VALLEY, and is sued in her individual and/or official capacity.  RITTER is a physician's assistant practicing under the license of Dr. DAVID KERNS in the "Center for Child Protection" operating within VALLEY.

41.    Defendant Dr. DAVID KERNS is employed by VALLEY, and is sued in his individual and/or official capacity. KERNS practices in the Center for Child Protection at VALLEY.

42.    Defendant Dr. ELIZABETH MAILHOT is employed by VALLEY, and is sued in her individual and/or official capacity. MAILHOT is employed as a department head in the Valley Medical Center Laboratory, at the VALLEY.

43.    Defendant CITY OF SAN JOSE (hereafter "CITY") is a municipality, organized and operating pursuant to the laws of the State of California. The SAN JOSE POLICE DEPARTMENT ("SJPD") is a governmental agency organized and existing pursuant to the law and policies of defendant CITY, which promulgated, encouraged, administered, and/or permitted, the policies, practices and procedures under which the individual defendant employees committed the acts or omissions complained of herein, and either intentionally or negligently, whether as a result of policies, practices, or procedures, or as a result of ineffective, non-existent, or inadequate training and education of employees, caused or were otherwise responsible for the acts or omissions of said employees as complained of herein.

44.    Plaintiffs allege that the policies, practices, and/or procedures of the CITY, as determined and effected by the individual defendants and other police officers of SJPD against plaintiffs, constitute and/or engender a circumstance and/or environment of deliberate indifference to the rights and safety of citizens of the community. The entities CITY and SJPD are referred to interchangeably herein as CITY.

45.     Specifically as to a known policy, practice or procedure involving the inadequacy of training, but not by way of limitation, plaintiffs allege that HOYT, and similarly situated police officers investigating claims of sexual and/or child abuse on behalf of CITY, received no training on the factoring into witness, suspect, or victim accounts of possible crime, the mental capacity of the person being interviewed, when assessing the validity of the alleged crime or abuse.  Plaintiffs allege that said failure to so train constitutes deliberate indifference to the rights of the witness, suspect, and victim, in that said failure creates a circumstance where officers such as the individual defendant police officers sued herein, cannot distinguish between valid and trustworthy statements of reasonable evidentiary value, and statements or testimony of persons with mental deficits and/or diminished capacity that if believed, lead to further invasive and intrusive actions by police officers, such as seeking and obtaining warrants for arrest and/or protective custody without a reasonable basis for doing so.

46.     Defendant WILLIAM HOYT is employed by the SJPD and is sued in his individual and official capacity.

47.     Defendant CRAIG BLANK is employed by the SJPD and is sued in his individual and official capacity.

48.     Defendant EVERGREEN SCHOOL DISTRICT ("EVERGREEN") is an entity providing for public education of California children, duly organized and existing pursuant to provisions of the California Education Code and California Government Code, and the employer of the employee-defendants set forth hereinbelow.  The employee defendants are referred to herein at times collectively, as the "EVERGREEN employee defendants."

49.     Defendant ROSE REAL is a teacher's aide employed by EVERGREEN and is sued in her individual and/or official capacity.

50.    Defendant ROBERT PRUITT is employed by EVERGREEN and is sued in his individual and/or official capacity.

51.    Defendant CLAUDIA BLODGETT is employed by EVERGREEN and is sued in her individual and/or official capacity.

52.    Defendant GARY KISHIMOTO is employed by EVERGREEN and is sued in his individual and/or official capacity.

53.    Defendant CHERYL HARMS is employed by EVERGREEN and is sued in his individual and/or official capacity.

### III. GENERAL ALLEGATIONS

**GENERAL ALLEGATION OF INTENT AND MOTIVE**

54.    Plaintiffs allege, that in the acts, omissions, and conduct of the defendants set forth herein below, commencing with the teachers and administrators of EVERGREEN, and continuing through the involvement of SJPD defendants, and all of the COUNTY employee defendants, there was an underlying bias in all phases and aspects of the acts, omissions, and conduct of the defendants, which was based on the presumption and assumption that TRACY WATSON had sexually molested his daughter O.S. This biased assumption continued well past the dropping of the allegation in the juvenile proceedings, which as initially pled, contained a claim that father had molested O.S.  This allegation was dropped in the middle of the jurisdiction trial, but COUNTY and CITY and VMC employees continued to operate on the unspoken (to the court) presumption that TRACY had molested his daughter.

55.    This pervasive belief system developed initially by REAL and HARMS, which with the assistance and insistence of CITY and COUNTY defendants grew to become the basis of a conspiracy to violate and/or maintain the violation of the family's civil rights of familial

association was the driving force leading to an immeasurable taint to all statements to investigators, presentation of "evidence" in the juvenile proceedings and HOYT's application for a search warrants (and the execution thereof), the interviewing of O.S. by HOYT and others, the recounting of interactions between Watson family members during visitation to the court and/or social workers carrying the juvenile case that were interactions which were in actuality innocuous, buy portrayed as sexual, inappropriate, suspect, or otherwise supportive of the proposition that TRACY had sexually abused O.S., disregarding their own and all related scientific standards for the collection, testing, handling of specimens, and reporting of positive Chlamydia results by VMC personnel.

56.    Further actions, without limitation, which support the allegation that the defendants were acting under the bias and premise of guilt as to TRACY having sexually abused his daughter and all presentation of evidence was colored thereby, include the individual defendants' repeated disregard of CITY's and COUNTY's own policies, practice, and procedures regarding child abuse referral investigations, disregard of California statutory law regarding the confidentiality of juvenile proceedings, disregard of California legislative intent specifying for reasonable efforts at the reunification of family members in juvenile dependency proceedings, and disregard of the pursuit of the truth as to whether any of the WATSON-STALKER children had been abused in any way.

**PRE-EXISTING BEHAVIOR BY O.S. / DISPUTES WITH THE SCHOOL**

57.    From approximately the age of four O.S. had developed a behavior that appeared at times to involve the self-stimulation of her genitalia.  On rare occasions she engaged in this behavior at school, and the behavior was related to stress in the academic environment when dealing with the processing and cognitive disorders aforesaid. Some of the behavioral

conduct, such as rocking forward on her chair with her hands holding the front edge of the

seat, was not even an attempt at self-stimulation, yet became treated as such after the disputes

between the parents and the school arose regarding O.S.'s Individualized Education Plan, as

set forth herein below.

58.     In June of 2004, the parents learned at a parent teacher conference that a month or two

prior a substitute teacher had considered making a report to CPS because of her concerns

about O.S.'s behavior, however, PRUITT dissuaded her from doing so, advising her that the

school was well aware of the behavior and it was not an issue that necessitated a call to CPS.

59.     By the time of the events complained of herein, any and every teacher or other school

related person who had worked with O.S. and is named in this complaint, was well aware of

this behavior, and well aware it had been occurring for years; some knowing this first hand,

some second hand.  During all of those approximately three years prior that O.S. attended

Norwood Creek, no teacher or school official had ever contacted CPS to make allegations of

abuse of any kind.  In addition, each named defendant teacher and/or school official, knew the

parents had engaged professionals to attempt to determine the origins and potential treatment

for the behavior.

60.     Then, on May 26th, 2005, after RENEE demanded a copy of her daughters school

records in regard to a dispute she was having with the school and defendant REAL over her

daughters educational progress and particularly, O.S.'s Individualized Education Plan

("IEP"), REAL contacted CPS to make a report of suspected child sexual abuse.  It was an act

of retaliation for RENEE having refused to agree with REAL's recommendations pertaining

to O.S.'s IEP and RENEE intent to initiate a Due Process proceeding challenging their

conduct.

61.     When these so called masturbatory-like behaviors began three years prior, TRACY and RENEE began consulting with several medical professionals to determine the cause and potential treatments to indentify the behavior, and end it or at least curtail it.

62.     Of the half-dozen or so professionals that were consulted with, or actually saw O.S., none ever made a referral to Child Protective Services with even an alleged suspicion of sexual abuse, despite the fact each was a mandated reporter under California law.

63.     O.S., as indicated hereinabove, had several developmental and psychological issues and determining the etiology of the behavior was difficult.  The behavior indeed was by appearance, timing, and observation of the parents, and confirmed by qualified medical professionals clearly related to stress affecting the child, such as testing in school and difficulty with subject matter in school.

64.     It was only after disputes arose between the parents and the school personnel, wherein RENEE complained that they were not doing an adequate job of educating her daughter and were refusing to follow through on the parents lawfully requested complete psycho-educational assessment – which had been agreed upon three months earlier - that REAL reported to CPS the allegations of O.S.'s behaviors, implying that O.S. had been sexually abused.

65.     Prior to making the referral to CPS, REAL and HARMS both went to the school psychologist, BLODGETT, and the psychologist told them that so-called masturbatory behavior is not necessarily a sign of child abuse or molest, but rather a manifestation of her disability and her way of coping with stressful situations.  Both REAL and HARMS decided they were not satisfied with that answer, and took it upon themselves to make the CPS referral – though it was agreed REAL would make the actual call, and undertake the investigation in

the manner explained and described by the call center representative of DFCS, Susanne

Jarrouj, with whom REAL spoke when making the referral.

**REAL MAKES CPS REFERRAL AND BEGINS INVESTIGATION**

66.    Almost immediately after the dispute arose with the manner in which O.S. was being

educated and the school was failing to comply with the agreement to make a reference for a

complete psycho-educational evaluation, REAL contacted CPS and claimed that O.S. had

emotional problems, was diagnosed with ADHD, and has had a problem in the past with

masturbation that had subsided but not completely stopped, and very recently she falsely

claimed was increasingly frequent and/or excessive.

67.    REAL also reported that she had seen the father bringing the child to school in piggy-

back fashion or on his side, though these latter points had nothing to do with her suspicions

about possible sexual abuse as the cause of the so called masturbatory behavior and plaintiffs

are informed and believe, and thereon allege, that these innocuous facts depicting normal

parent child relations were posed to CPS by REAL as in some way significant for possible

sexual abuse by TRACY specifically.

68.    In the telephone conversation Jarrouj advised REAL that the claims she was making

were not sufficient to adduce that there was any sexual abuse or other abuse going on, so she

directed REAL to go back to the child and ask her "questions."

69.    The request by Jarrouj was done pursuant to a policy, practice, or procedure of

COUNTY whereby inexperienced interviewers and persons with no training and background

in the importance of interviews or how to properly conduct one, and without any knowledge

of the CPS call center representative as to the skill or experience level in child abuse

investigation of the mandated reporter who has called in, are routinely asked to go perform

further investigation on behalf of DFCS, including but not limited to the questioning of young children, some of whom, as in the case of O.S., may have cognitive or psychological issues that make the interview process fraught with potential errors and risk to the child and family, and of the nature and type that should only be handled by a trained and experienced child abuse investigation professional.

70.     Thereafter, and acting for all intents and purposes as a de facto agent of CPS, REAL and HARMS proceeded to remove O.S. from class on two separate occasions for the specific purpose of performing their "CPS" investigation.  Defendants REAL and HARMS were using school time dedicated to fulfillment of O.S.'s IEP goals and requirements, to investigate pursuant to the direction of the CPS representative Jarrouq, and to act as de facto CPS investigators without any qualifications for doing so.

71.     At no time prior to removing O.S. from class for the purposes of this investigation, did REAL or HARMS obtain the parents consent or advise them of their intent to interview their child, or advise them of the allegations of possible sexual molestation that REAL and HARMS were contemplating.  By acting pursuant to the policy and practice of CPS, as directed by Jarrouq, REAL and HARMS, though acting as agents for CPS, did not inform the parents of the allegations as social workers are required to do at first contact, pursuant to Title 31:XXX of California regulations governing social workers employed in child protective service agencies.

72.     REAL and HARMS proceeded to sequester O.S. away from her fellow classmates and question her, including encouraging her to make "drawings," in an effort to get "more evidence" to provide to CPS.

73.   REAL questioned O.S. without informing O.S. of her intentions to question her about her alleged suspicions of abuse, and also, in violation of state law and DFCS protocol, without asking if O.S. wanted any other familiar adult whom she trusted to be present.

74.   The policy and practice of enlisting persons like REAL to conduct investigations into concerns of sexual abuse, constitutes deliberate indifference to the rights and safety of allegedly abused children and their families, in that it puts untrained and unskilled interviewers in a position of conducting investigations which are far more likely to result in incorrect collection of information, invasive and emotionally harmful interviews of children, uninformed decisions and concerns on significance of the behaviors and/or statements of a suspected child abuse victim, failures to comply with Title 31 regulations applicable to investigating emergency response social workers, and based on all the foregoing deficiencies, unwanted involvement and/or further unwarranted involvement, including as in this case, unlawful intervention and removal of children by law enforcement and or CPS, causing severe emotional harm and trauma in the lives of the children and their families.

75.   REAL had absolutely no training or experience in the forensic interview of children suspected or alleged to be the victims of abuse. REAL had no training on the facts or circumstances to consider in determining whether there had even been any abuse at all.

76.   After the call to CPS, and then consulting with PRUITT, and PRUITT instructing REAL that he felt she was the best candidate for questioning O.S. due to her familiarity with the child, REAL then took the child out of class and engaged O.S. in a conversation intended to elicit information about REAL's perceived suspicion of sexual abuse.  Through suggestive and leading questioning, REAL was able to influence O.S. to make a drawing that O.S. stated depicted TRACY and her in the bathtub together.

77.   PRUITT knew that as a mandated reporter he was not authorized nor trained to conduct any type of investigation upon a referral of abuse.  Despite knowing this at the time, and not desiring to violate policy himself, PRUITT instructed REAL to perform the investigation so as to shield himself from any liability for doing so, and knew or reasonably should have known that neither REAL nor HARMS was qualified to engage in an investigatory interview of a minor child regarding any kind of abuse, much less sexual abuse.

**CONDUCT OF REAL / HARMS / KISHIMOTO RE: VIOLATIONS OF A.D.A.**

78.   Defendants REAL and HARMS were aware of O.S.'s disabilities and cognitive/psychological impairments having been in existence from 2003 and forward. REAL and HARMS did personally, and directed others, to question the validity of O.S.'s disability and special needs without any reasonable basis. This unwarranted denial manifested itself in a failure to provide a supportive environment or other actions needed for O.S. to enjoy the benefit of her daily activities at School and receive the benefits of an IEP.

79.   REAL and HARMS specifically engaged in harassing and demeaning conduct towards O.S., which included, but was not limited to, verbally berating and humiliating O.S. in front of other pupils for her involuntary conduct including the so called masturbatory conduct caused by her disabilities.

80.   Additionally, REAL and HARMS took advantage of O.S.'s disability and resulting vulnerability to try to influence and suggest to her unlawful and despicable and fabricated sexual conduct by her father against O.S., though O.S. never wavered at any point, from the inception of these events to the date of filing of this complaint, that she was not molested by any person, including her father.

81.   With knowledge of her disability and despite a duty to provide her with accommodations pursuant to O.S.'s IEP, defendants REAL and HARMS intentionally and maliciously refused to provide any accommodation for O.S.'s disability, but rather sought to interfere with her daily academic activities.

82.   Plaintiffs are informed and believe that either BLODGETT or KISHIMOTO was the person responsible for the collection of IEP plans and selection of vendors to fulfill the requirements of IEP agreements.  When BLODGETT and/or KISHIMOTO submitted the request to a psychological testing/evaluation vendor to the school district who provided such services, she/he intentionally did not include the parents request for a full psycho-educational assessment.  In doing so, defendant interfered with the rights of O.S. to the benefits of special needs children under an IEP.

83.   EVERGREEN employee defendants PRUITT, HARMS, and REAL, and each of them provided false information and testimony to the juvenile court during the ensuing juvenile court proceedings, for the purpose of concealing their harassment and discrimination of O.S. related to her disability, and participating as directed by SINGH and LETONA, to testify in a manner, and selectively, to assist in the pursuit by COUNTY of juvenile court jurisdiction over the minor children.

84.   Additionally REAL intentionally fabricated documentation she knew was to be submitted to the juvenile court for the purpose of misleading the juvenile court in furtherance of her efforts to conceal the harassment and discrimination of O.S., and exact retaliation against O.S. and her family for RENEE's having pressed the psycho-educational assessment.

85.   BLODGETT intentionally submitted selectively documented information to the Court for the purpose of concealing the district's wrong doing and misrepresenting the facts surrounding O.S. and her psychological circumstances to the court.

86.   The documents BLODGETT presented to the CPS counsel SINGH for use in the juvenile court in the beginning of the actual juvenile jurisdiction trial, which she represented were from O.S's education file at the school, were not produced pursuant to the lawfully served subpoena submitted by plaintiffs upon EVERGREEN.  The documents were either fabricated by BLODGETT or withheld from plaintiffs by EVERGREEN in order to surprise plaintiffs at trial on the issue of court jurisdiction over the children.

87.   The EVERGREEN employee defendants also undertook to engage O.S. in certain un-authorized psychological testing and assessment by way of the questioning of O.S. and the request to make certain drawings which were then submitted to CPS and the court, all of which testing and assessment was unrelated to O.S.'s education.  The testing and assessment engaged included non-scientific assessments and methods performed by non-qualified individuals.  PRUITT authorized the assessments, with full knowledge they were not lawful.

88.   The purpose of the testing and assessments was not authorized by statute in that it was directed towards deflecting attention of the parents and CPS from the harassment, violations of law, and discrimination of the EVERGREEN defendant employees, as opposed to furthering the educational needs of O.S., and was done without notice to TRACY and RENEE and without their consent in violation of the law.  The testing and assessment undertook by the EVERGREEN defendant employees REAL and HARMS, resulted in unreliable and tainted misinformation that would ultimately lead to later and further accusations of sexual

abuse and the filing of a W&I 300 section dependency petition in the Santa Clara County Superior Court, Juvenile division.

89.     The unauthorized conduct of the defendants and the tainted fruits of those efforts served the effect intended, which was to provide misinformed parties with a means for taking and removing the children from the family home and their parents, despite the fabrication of the information and without legal justification, and were intended to cause, or undertaken with reckless disregard for the likelihood of causing the plaintiffs O.S., TRACY, and RENEE, and the children severe emotional distress.

**CPS BECOMES INVOLVED**

90.     As a result of the call from REAL and/or another unknown individual from EVERGREEN to CPS, on May 26th, 2005, RAMIREZ was assigned to investigate the matter.

91.     The matter was classified at intake as one requiring only a 10 day response, meaning that within the procedures of CPS the assigned social worker had 10 days to investigate the matter and perform a face to face interview with the child or children; the situation was not emergent enough to require an "immediate response" or a 24 hour response.

92.     On the evening of June 7th, 2005, RAMIREZ called the Watson home for the first time at approximately 8:55 p.m., 12 days after CPS had first received the referral. She explained that she was investigating a referral regarding O.S, and immediately demanded to come over the next evening at 7:00 p.m. to discuss the referral.

93.     TRACY asked her what this referral was about and she replied that she couldn't discuss it over the phone but it involved some allegations involving O.S.  When TRACY asked her again what this was about, she repeated her demand to come over the next evening to discuss the matter in person. TRACY told her that Renee was upstairs with the children, and that as

soon as they put the children to bed, he would return her call. She gave TRACY her direct

line phone number, and the call concluded.

94.    At approximately 9:10 p.m., TRACY returned the call to RAMIREZ with RENEE

present and again immediately TRACY asked her what the allegations were about.

RAMIREZ stated there had been some allegations made and that she needed to meet with the

parents and O.S.; still refusing to respond to TRACY's questions.  When TRACY again asked

who made these allegations, RAMIREZ replied that she could not divulge who reported them,

but could explain more when she met with them.  TRACY asked for more details and

RAMIREZ refused, saying it was "not our policy [to give the parents details over the phone],

we prefer to meet parents face to face."

95.    TRACY again stated that he still didn't understand what this was about and was not

comfortable with a government official for CPS calling me up late in the evening, mentioning

allegations regarding his daughter, but refusing to provide any details, and demanding

TRACY and his wife to meet in their home with no other explanation.  At that point,

RAMIREZ stated that she knew that O.S. was a "special needs" student, and that she had an

IEP.

96.    TRACY replied that since only they (he or RENEE) or the school knew the facts about

special needs and an existing IEP, the referral had to have come from the school.  This was

significant to TRACY and RENEE because RENEE had just called the school district the

previous day to complain about the school's failure to refer O.S. for a complete psycho-

educational evaluation as agreed, in addition to the recent dispute set forth hereinabove with

regard to O.S.' progress.  This immediately led TRACY and RENEE to believe that possibly

the school had made a referral against them in order to retaliate for their insistence on a complete psycho-educational assessment of O.S.

97.     RAMIREZ repeated she could not tell them who had made the referral. TRACY asked her why Social Services was involved, and RAMRIEZ answered it was her job to follow up on any referral concerning an allegation of abuse. TRACY then asked when the referral was made, and she replied, "oh, sometime in the last few months."

98.     While RAMIREZ would not state the specific allegations, she did continue to assert that she was investigating allegations regarding O.S., and that she would explain everything once she had an opportunity to interview O.S. without the parents.

99.     RAMIREZ, in furtherance of the conspiracy with LETONA, BURGAN, CASTALDI, and SINGH, a conspiracy later joined by BAUM, to make the children dependent children of the court and ensure the continuance of the violation of the rights of familial association amongst plaintiffs herein, later lied under oath in the juvenile proceedings saying that she had not told TRACY that the claims involved sexual abuse, and then using that false claim to bolster the argument that the parents essentially had something to hide by virtue of the fact that after speaking with RAMIREZ the parents had O.S. seen by a psychologist and medical doctor for an evaluation which included an evaluation for sexual as well as physical abuse.

100.    RAMIREZ, however, documented in her case notes about the call that TRACY had not been told the "specific allegations," but yet his actions were suspicious because he refused to meet with her without an attorney present.  This was false, as TRACY asked her if he could "consult with an attorney" and call her back, and she said that was fine. TRACY never refused to speak to RAMIREZ without legal counsel present.

101.   TRACY told RAMIREZ that he felt this was very "Kafkaesque," and again expressed confusion that this somehow involves his daughter, there are allegations, but she can't tell them about them. TRACY went onto explain that they had been having problems with the school staff about O.S.'s education, and her Individualized Education Plan,  and that based on that the timing of the call was suspicious.

102.   TRACY told RAMIREZ that he didn't feel her mentioning something serious involving his daughter– but then refusing to disclose the problem - was very fair.  RAMIREZ's response was, "well, we could have just shown up at your door." To this comment TRACY replied, "Is that a threat? Are you actually threatening us?" RAMIREZ did not respond. TRACY then asked, "This sounds serious, and seems to have legal issues. What are our rights as parents?" RAMIREZ replied that she could not advise them on their legal rights as parents.

103.   RAMIREZ stated once again that she needed to come over the next evening, and asked would 7:00 pm work for them? TRACY repeated this aloud to RENEE, who said quietly to TRACY that she did not want Social Services in their home.

104.   TRACY asked if they could meet somewhere else and RAMIREZ suggested they could come to the Social Services building on Julian Street. TRACY then told RAMIREZ that he wasn't comfortable meeting until they had time to confer with an attorney about Social Services investigations. In response to the statement that they wanted to confer with an attorney RAMIREZ immediately stated, "You can't have an attorney. It's not our policy." To which TRACY replied, "It's our right to speak with an attorney. Your policy isn't the law, is it?" Again RAMIREZ did not respond. She repeated that they could not have an attorney present, and that it was still "informal" at this point.  RAMIREZ again became impatient at this time and said, "I am required to follow up on anything of a 'sexual nature.'"

105.  TRACY replied that it did not appear to be informal, but they (meaning he and his wife) still wished to meet with her once they had conferred with an attorney. TRACY then asked RAMIREZ if he could call her back later in the week after they had made contact with an attorney. She acknowledged that they could call her back, and at that point expressed no sense of urgency, despite her prior demands to meet the very next evening. TRACY assured her he would call her back by the end of the week.

**PARENTS RETAIN COUNSEL / PERFORM EVALUATION OF O.S.**

106.  After the call from RAMIREZ, RENEE immediately called the one physician they knew who might be available on such short notice to examine O.S., a Dr. David Waggoner, who was the doctor that actually delivered O.S. RENEE spoke with the doctor at approximately 9:40 p.m. and explained the situation to him, saying they needed to know if there was something physically wrong with O.S.; he said he'd arrange for O.S. to be seen late in the afternoon the next day.

107.  O.S. was seen by Dr. Waggoner and subsequently interviewed by a P.O.S.T. trained former police officer named Harvey Shapiro, who conducted the interview in front of a trained forensic psychologist named Dr. Randy Rand (a mandated reporter who monitored the interview for O.S.) and documented by investigator Carol Palacio.  None of these individuals, including the mandated reporters, upon evaluating O.S., saw any basis to make a report of child abuse or sexual abuse of any kind.

108.  On Friday, June 10th, 2005, within the week as TRACY had promised to RAMIREZ he would, TRACY called the direct line of RAMIREZ at approximately 4:00 p.m. She was unavailable, so after listening to her outgoing recorded greeting, TRACY left her a message, apologizing for the delay in getting back to her and explaining that was due to the absence of

his counsel for a couple of days, and expressly telling her that he and his wife were anxious to meet with her and resolve any questions she might have.  He invited RAMIREZ to call him back and left his phone number.

109.   RAMIREZ documented that she had received the call in her case notes, but that she had not retrieved it until five days after the call.

110.   On June 15th, 2005, at approximately 1:45 p.m., TRACY called RAMIREZ again, and this time spoke to her on the phone.  When RAMIREZ asked TRACY how he was doing, he replied that he was, "frankly, a little distressed about receiving your call, and I still do not know what's going on-."  TRACY did not know what was "going on" in terms of the specifics of the allegations because as RAMIREZ documented, she had not told him the specifics of the allegations, and even though TRACY asked again, again she refused to tell him of the specific allegations during this phone call.

111.    TRACY pointed out that they had now consulted with an attorney and they were willing to meet with RAMIREZ with their attorney present.  Again, RAMIREZ told him in no uncertain terms that the parents attorney could not attend any meeting, stating in part, "No– that can't happen," and further "I'm trying to explain it to you. We don't meet with attorneys because that would  be very formal, and I'm sure your attorney is aware of that– it's not a new policy."

112.   COUNTY has a policy, practice, or procedure, evidenced by RAMIREZ conduct, wherein they refuse to meet with parents who assert their right to have an attorney present during an interview regarding allegations of child abuse, and as the indicated in the facts set forth hereinbelow, retaliate against parents who assert their rights to counsel or their rights as parents and innocence of allegations.

113.  This refusal to allow parents to meet with CPS if they want their attorney to attend is a policy, practice, or procedure that is deliberately indifferent to the liberty interests at stake in the context of a CPS investigation, which include the possibility of the removal of children from their parents and therefore a violation of their rights of familial association.  RAMIREZ acknowledged removal is a potential outcome of a CPS investigation, making the statement on June 15th, 2005, to TRACY that, "We're not going to just go in and take people's children– that's not what we do. But of course, that can happen. I'm not going to lie to you– it can happen in the highest risk cases."

114.  This policy, practice, or procedure of COUNTY and its employee social workers, of retaliating against parents who assert their right to have the assistance of counsel in the context of a CPS investigation was also reiterated by THOMPSON to HOLT, as set forth herein below.

115.  In addition to the last statement noted above by TRACY, indicating he still did not know what the allegations were, TRACY also stated during this very phone call, "TW: Okay. Well again, we're kind of stuck in a nameless, faceless allegation thing here, but– we shouldn't be concerned?!"

116.  The contact ended with TRACY informing RAMIREZ that in light of her refusal to meet with the parents and child with their attorney in attendance, he would have to call his attorney and get back to her.  At no time did RAMIREZ indicate any sense of urgency to TRACY, even stating, "we're just talking at this point".  Four weeks after receiving what was coded by CPS as a "10-day referral," RAMIREZ left on a vacation for over one week, and made no further attempt to contact either parent, the children, the parents' counsel, or any school personnel.

**INVESTIGATION TRANSFERRED TO TRAN**

117.  On or about June 23rd, 2005, defendant TRAN received the file regarding the Watson family after RAMIREZ left on vacation.  Upon receiving the file, without having spoken to anyone in the Watson family, anyone from the school, or with RAMIREZ, TRAN cross-reported the case to the San Jose Police Department by fax. TRAN reviewed the file when he received it, noting the case note entries on the matter made by RAMIREZ.

118.  Working just off of the notes and records compiled by RAMIREZ at that point, which did not include any interview of the child or parents, TRAN went to the home of the family on June 24th, 2005, at approximately 11:30 a.m. He was with another man, and both were greeted by Blanche Houston, who was providing babysitting services for the parents.  TRAN asked, "Are you Renée Stalker?" To which Blanche replied, "no-- who are you?" Without identifying himself or the other man, TRAN did not answer her question. Instead, he replied, "Is there another parent in the house?"

119.  Blanche then stated, "The parents are at work. Who are you, and what do you want?" TRAN then asked, "When will they be back?" To which Blanche answered, "Who are you?" TRAN replied "I can't tell you what it's concerning, but I need to speak to the parents." Blanche advised the men that the parents would return after 2:00 p.m. that afternoon. Without acknowledging her comment, the two men turned and walked away.

120.  Blanche then contacted RENEE at work, disturbed that there were men asking for her who refused to identify themselves. RENEE then contacted TRACY and related what had happened.  Concerned that apparent strangers were asking about his family, TRACY cut his meetings short and returned home as soon as possible, arriving about 12:30 p.m.  Neither man

returned that day after 2 p.m., and TRAN never attempted to contact either parent before the events of June 29th, 2005, set forth below.

121.   TRAN also knew that TRACY and RENEE had an attorney upon his review of the file from RAMIREZ, and knew that attorneys name and phone number. RAMIREZ had in her notes that the parents' attorney had called her and left a message; TRAN had read those notes. TRAN never attempted to reach the Watsons' attorney prior to the removal of the children on June 29th, 2005.

122.   TRAN was able through his position as a social worker to know who the actual reporting party was at the school, however, he also never contacted nor spoke to the reporting party about the allegations prior to the removal of the children on June 29th, 2005.

123.   TRAN performed absolutely no further investigation into the allegations regarding O.S. from the point of the June 24th, 2005 visit to the WATSON home, until the removal of R.W. and S.W. on June 29th, 2005.

**SAN JOSE POLICE DEPARTMENT BECOMES INVOLVED**

124.   TRAN had also sent a second cross-reporting fax consisting of various documents from the DFCS file to the S.J.P.D., this second time on June 27th, 2005.  He was contacted in response to the fax by BLANK two days later, on June 29th, 2005, who told him to come to the police department to discuss the matter.

125.   On June 29th, 2005, TRAN met BLANK and HOYT at the S.J.P.D. offices in San Jose, and the matter of the abuse referrals from EVERGREEN school was discussed.  BLANK and HOYT decided to go out to the WATSON house immediately.  BLANK, HOYT and TRAN made the decision to remove the children, without having spoken to anyone about the matter,

and documented their intention to do so in notes of the meeting between them held before going to the Watson family residence.

126.   When the officers were on the front porch before entering the Watson home without a warrant or consent to enter, they told Blanche Houston, who was again watching the children, that they were "probably" going to take the kids.  It is unknown at this point in time which officer made this statement, but defendants BLANK and HOYT were present and did enter the home as set forth below.

**THE REMOVAL OF S.W. AND R.W.**

127.   On June 29, 2005, 33 days after the initial CPS report, 6 to 8 SJPD officers, including BLANK and HOYT, entered the home of RENEE and TRACY when they were not at home, without a warrant, under the guise of a "welfare check" on the minor children. The only persons home were a maternal relative Jacquelyn Weddle, children's grandmother and Blanche Houston who was the nanny for the children, and S.W. and R.W the younger siblings of O.S..

128.   Ms. Weddle was beside herself with the situation of the police officers being in the house, so she called TRACY on his cell phone, telling him that the house was filling up with uniformed officers who were swarming the home and searching the entire house.  TRACY asked her if anyone had told her why, to which she replied "no," and he asked if she could ask someone why and call me back.

129.   TRACY then spoke with BLANK, who identified himself as a police officer with the San Jose Police Department.  TRACY then asked, "What is the problem?" BLANK replied, "We're conducting an investigation into a report of sexual abuse on Olivia Stalker." TRACY then said, "Coming into my house with several other police officers doesn't sound like an

investigation. Do you have a warrant?" To which BLANK replied, "No– we don't need one."TRACY then replied, "Yes you do– get out of my house."

130.   BLANK then raised his voice, and asked, "is [O.S.] with you?" TRACY did not answer him, and instead stated, "You've already said you do not have a warrant, and were not invited into my home. Get out of my house now." BLANK sounded audibly distressed and raised his voice and then stated in a threatening tone, "You need to drive the victim to this location so we can conduct our investigation." To which TRACY replied, "Why would you assume she's a victim of something if you're still investigating?"

131.   Raising his voice even louder, BLANK said "Are you going to return [O.S.] to this location so we can conduct our investigation?" TRACY answered, "I'd be happy to meet you at the police station with Olivia and our attorney."

132.   Now in an even louder and more threatening voice, BLANK stated, "You're now interfering with this investigation. Since you are not willing to produce the victim for an interview, I'm going to have to refer this to the District Attorney for possible obstruction charges." To this TRACY replied, "Then you would be a liar. I've already stated my willingness to meet with you and our attorney. I'm not interfering with anything. You are the one in my house without a warrant."

133.   BLANK responded, "You have until 4:00 p.m. to produce the victim." TRACY replied, "it is ridiculous for you to think I can drive all the way home to San Jose at this hour to meet your deadline.  I've already told you that I'll be happy to meet you at the police station with [O.S.] and our attorney, but at any rate, it is impossible for me to get home by-- " BLANK then abruptly hung up.

134.  BLANK then went outside and spoke to TRAN, and they then carried out their original intent to remove the children.

135.  TRAN then entered the home to conduct his own investigation.  He also did not have a warrant, consent, or exigent circumstances such that there was an imminent risk to the children that would lawfully obviate the need for a warrant. At no time did TRAN speak to either Ms. Houston or Ms. Weddle, nor did he inspect the home as would be expected had TRAN intended to take any reasonable efforts to avoid removing the children from their home and family.

136.  At the direction of supervising officer BLANK, HOYT, in agreement with TRAN, the children were removed and other officers did place S.W. and R.W., the latter of which was a breast-feeding infant at the time, into car seats the police and TRAN had brought to the scene in advance of the removal, forcibly removing the children from their home.

137.  At the time of the removal, and prior thereto, it was evident immediately upon entry into the home that it was immaculately cared for and clean, with plenty of children's toys and food and clothing available for the children, and the children were properly supervised with two adults providing care.

138.  The unlawful search and seizure was a result of an ill conceived custom, policy or practice at the SJPD, to act in concert with DFCS in ignoring the Constitutional protections against unlawful search and seizure when allegations of sexual abuse against children are made, and to simply enter persons homes without a warrant, without consent, and in the absence of exigent circumstances that would excuse the obtaining of a warrant.

139.  The unlawful action was also a result of non-existent and/or inadequate training of SJPD officers in the area of child abuse investigation generally, and the rights of familial

association and warrant requirements for removal of children specifically, as evidenced by the actions of HOYT and BLANK performing no investigation whatsoever prior to determining to remove the children before even leaving their police station.  Said policy, practice, procedure or custom, and or the lack of training specified, constitutes deliberate indifference to the rights of parents and children, and is a driving force in the removal of children by SJPD officers, and specifically, as applied in the matter involving the Watson family.

140.   The decision to remove children, or force entry into a home in the course of a child abuse investigation, does not require supervisory clearance or approval at SJPD, and the police officer is the decision maker for all actions of entry, search, and seizure, without supervision.   This is the policy, custom and practice at SJPD.

**THE REMOVAL OF O.S.**

141.   The next day, June 30th, 2005, the parents' attorney Mr. Clancy made arrangements to present O.S. at the SJPD station for purposes of a  Multiple Discipline Interview ("MDI"). These are held in a San Jose location, known as the Multiple Discipline Interview Center ("MDIC").  The purpose of the MDI is to avoid multiple interviews of children by law enforcement, social workers and others, by having a single taped interview where one questioner speaks with the child and any other interested parties can observe the interview from behind a two way mirror and provide input to the questioner on topics specific to their own interests.  O.S. was transported to the MDIC by her grandmother, who was allowed to remain in the room with O.S. to support her during the interview.

142.   SJPD officer HOYT, refused to allow O.S.'s attorney to observe the interview, saying it was the "policy" of the SJPD not to allow attorneys to observe an MDI.  This statement was false; there is no policy of the CITY or SJPD to exclude attorneys from observing an MDI.

**THE FIRST MDI INTERVIEW OF O.S.**

143.  By the time of the first MDI interview of O.S., HOYT was well aware of various psychological, emotional and/or behavioral problems afflicting O.S.  In the first MDI of O.S., HOYT proceeded to interrogate O.S. for approximately one hour and twenty minutes.  Aside from this time in the actual interview room, he also interrogated O.S. outside of the interview room, then brought her back into the interview room for further questioning.

144.  HOYT had no training interviewing children, particularly children with learning disabilities, diagnosed with ADHD, and on medications for treatment of ADHD, and no training interviewing a developmentally delayed special needs child such as O.S.  He still proceeded with his interrogation, and the entire time was spent using inappropriate suggestive and leading questions, an accusatory if not intimidating tone and body language.

145.  In addition, HOYT himself conducted the interview, knowing he was violating the Child Abuse Protocol for Santa Clara County Law Enforcement ("Protocol") for conducting this type of interview.  There was an established Protocol at the MDIC whereby only qualified persons with special training and expertise were to conduct the interview in the case of a child that was disabled or had special needs. A list of such persons approved by either CITY or COUNTY or SJPD is kept at the MDIC.  HOYT is not on that list.

146.  HOYT repeated the same questions over and over, and told the child repeatedly that he was there to get the "truth."  O.S. repeatedly denied that anyone, ever, had touched her inappropriately.  HOYT also continued to interrogate O.S. outside of the MDI center in the vehicle during transport from the MDIC to the Shelter maintained by the COUNTY for

children removed from their parents or caretakers, again acting in violation of the Protocol, and in violation of the purposes of the single-interview policy of the MDIC interview process.

147.   HOYT tried repeatedly to elicit in the MDI interview, some sort of disclosure about father and O.S. being in the tub together in the sense that something was inappropriate or sexual about a father being in the tub with his young daughter generally, and/or that TRACY had sexually molested O.S. in the tub.

148.   O.S. told HOYT she had been in the tub one time with her dad, at an age she didn't recall or was when she was the age she was at the time (8), and it happened when she had gone through the house looking for him after he returned from a run, had found him in the bathtub, and jumped in the bathtub with him making a "big splash."

149.   The entire recounting of this event by O.S. was accompanied by smiles and laughter from the child, who also recounted how her father's newspaper got wet and soggy, which she laughed about as well.

150.   At the completion of the interview, HOYT took O.S. into protective custody, and/or did so at the direction and upon the decision of THOMPSON, and/or THOMPSON took the child into protective custody, and/or the decision to take the child into custody was made jointly between them.

151.   In the car, on the way to the Shelter, HOYT's questioning became even more accusatory to the premise that TRACY had in some way sexually abused O.S.  O.S. continued to deny that her father had abused her in any way, and asked HOYT why he had taken her brothers.

152.   At the conclusion of the interview at the MDIC, THOMPSON demanded to the parents attorneys, that RENEE and TRACY attend a meeting with them.  The attorneys indicated that

their clients would only meet with CPS personnel with their attorneys present.  THOMPSON

refused to have a meeting with the parents counsel present, and stated that fact to HOYT, but

not to the parents, and further stated to HOYT that based on the parents refusal to meet with

her and unknown others from CPS without their attorneys present, she wanted HOYT to take

the child into custody, or she personally was taking the child into protective custody, and was

not returning R.W. or S.W. to the parents either.

153.  On the date of the MDIC interview, RENEE was with her attorney and the attorney

requested that CPS personnel conduct the interview at that time, but refused due to the fact

that counsel was present.

154.  At no time, did HOYT or THOMPSON make any effort of any kind to explore any

reasonable alternative to the removal of O.S. from both of her parents and her home.  At no

time, did HOYT or THOMPSON secure any evidence of any kind that father or mother had in

any way sexually abused, physically abused, or emotionally abused their child, and in fact,

both listened and observed the MDI as O.S. repeatedly denied there had been any physical,

sexual, or emotional abuse of her at any time, and described parents who told her to tell

someone if anyone ever touched her "private parts."

155.  O.S. was taken into "protective custody" without a warrant, and in the absence of

imminent risk of serious bodily injury, and without consent of either of her parents.

156.  TRACY was not allowed to see his children for two straight months after their removal,

despite the lack of any evidence that TRACY had ever committed any abuse, much less

sexual abuse, on any of his children.

**DETENTION OF THE CHILDREN CONTINUES**

157.   The circumstance of the removal of the children, led to immediate involvement of LETONA, as the case carrying social worker assigned to the case by DFCS.

158.   Pursuant to California law, W&IC 309, 319, LETONA was required to do an independent investigation into the circumstances surrounding the removal, the need if any for further detention, and make reasonable efforts to return the children to one or both of their parents, and their home, unless one of four possible exceptions applied (which did not apply).

159.   LETONA did no such investigation, nor made any reasonable efforts to explore alternatives to the continued removal of the children from the care and control of both parents.

160.   BURGAN ratified, condoned, authorized, and/or permitted the actions of LETONA in continuing to detain the children without independent investigation, in failing to use reasonable efforts to ascertain possible placement resolutions that would allow the children to be returned home, and in refusing to return the children to one or both of their parents, despite the fact there was no injury to either boy, and O.S. had adamantly denied any abuse.

**JUVENILE PROCEEDINGS COMMENCE**

161.   On July 1, mother RENEE and her attorney met with BURGAN and COUNTY COUNSEL Mike Clark under the guise of an interview about the facts and circumstances that had brought O.S. to the attention of DFCS, only to learn that in fact a juvenile dependency petition seeking to maintain the separation of the children from their parents, had already been filed with the Superior Court of the County of Santa Clara.  Thus with full knowledge that DCFS had commenced legal proceedings to continue the removal of the children from their parents, BURGAN and Clark questioned RENEE with counsel present, and with knowledge

that the parents had retained counsel for the very case they had filed, a juvenile dependency proceeding.

162.   In this meeting, BURGAN still failed and refused to tell RENEE or her counsel what the allegations exactly were that caused HOYT and THOMPSON to remove the children.

163.   Plaintiffs are informed and believe, and thereon allege, that it was at or about this time (July or August of 2005) that regular contact was made with SPARKS, who participated in the formulation of the conspiracy to take all measures possible, whether or not legal or ethical, to ensure the assertion of jurisdiction over the children by the juvenile court, inclusive of the obtaining of assistance from EVERGREEN employee-defendants and VALLEY employee-defendants described herein above and herein below.  Further, that SPARKS, whether formulating the plan to violate the plaintiffs due process rights or not, subsequently ratified and affirmed the efforts of BURGAN, LETONA, CASTALDI, and BAUM, to delay in reunifying the WATSON family, based on the conviction of said defendants that in fact TRACY had sexually molested his daughter, and that their efforts outside of the reunification mandate statutorily expressed under California Welfare & Institutions Code provisions 300, et. seq., and Title 31 Regulations governing the practices of social workers in California to obtain evidence of such molestation, should take precedence over the rights of the family to reunify and continue their lives without government intervention.

**AARON WEST APPOINTED TO REPRESENT CHILDREN**

164.   At the initial detention hearing in the juvenile dependency case held July 5th, 2005, the court appointed Santa Clara County District Attorney's Office to represent the interests of the minor children.  It ended up being WEST, that was appointed to represent the children, and she began to do so around approximately July 8th, 2006.

165.   Throughout the proceedings, WEST committed the following actions, or engaged in the following omissions to act, and thereby failed to represent O.S., S.W. and R.W. in a reasonably competent and professional manner, and but for such conduct, did thereby cause the children O.S., S.W., and R.W. damages as set forth herein below;

- WEST failed to make any independent reasonable effort to investigate the allegations of DFCS regarding sexual abuse of O.S., as required pursuant to the law governing her appointment (Welfare & Institutions Code Section 317),

- WEST failed at any time to consider or argue to the juvenile court the repeated claims of her own client O.S., that any such claims of abuse or molestation were in fact false, and did not argue against the placement of the children away from their parents when neither parent was found to have ever contracted Chlamydia or have been treated for Chlamydia.

- WEST failed to take any reasonable action to investigate the appropriateness of the placement of the minor children in the first all Spanish speaking home in which they were placed after 8 days in the shelter, despite WEST's knowledge that S.W. had a speech related impediment or malady, and that placement in a home that spoke primarily an entirely different language than English, in which S.W. had been raised and tutored, would adversely affect his speech development,

- WEST failed to take any reasonable action to insure that the children's special needs were being met by their placement and supervision,

- WEST engaged in a joint effort and conspiracy with LETONA, BURGAN, BAUM, CASTALDI, and SINGH, to thwart the reunification of plaintiffs as a family, without any reasonable basis for doing so in direct contravention of her professional responsibility as a court appointed attorney for children to represent the interests of her clients,

- WEST failed to perform her duties consistent with the standard of care for an attorney representing minors in a W&I 300 proceeding,

- WEST failed to regularly and clearly communicate with her clients regarding the court processes and circumstances affecting their continued separation from their parents,

- WEST violated at least the following rules of professional conduct during the course of her representation of the minors herein: California Rules of Professional Conduct, 1-100; 3-110; 3-200; 3-310; 3-500,

- WEST engaged in administrative and investigative activity outside the ordinary scope of litigation for the purposes of thwarting efforts of the plaintiffs to reunify as a family, including but not limited to meeting with adverse parties to her client and/or their counsel, and seeking to suppress evidence from disclosure to the adult plaintiffs herein and/or their counsel and the court, in the juvenile proceedings,

166.   WEST, pursuant to a policy, custom and practice of the Santa Clara County District Attorney's Office undertook representation of the minor plaintiffs in this case despite a direct conflict in that the Santa Clara County District Attorney's Office was acting in concert with the City of SJPD Department as part of the prosecution team for the purpose of investigating potential criminal charges against WATSON and/or STALKER for conduct related to the claims that led to the Welfare and Institutions code section 300 dependency proceeding described hereinabove.   Under said circumstances, WEST and the Santa Clara County District Attorney's Office did not have such independence as required to adequately, effectively, and ethically, represent the children's best interest in the dependency proceeding.

**VALLEY CONDUCT RE: CHLAMYDIA TESTING**

167.   Defendants HAMILTON, NOBLE, and KAHLE, did engage in intentional, bad faith, and reckless conduct related to attaining, fabricating, and destroying evidence used against plaintiffs in the W&I 300 dependency proceeding, which evidence said defendants knew was to be used in said proceedings, and did on several occasions present to the Superior Court personally, as evidence of a Chlamydia infection which did not exist and/or did not meet VALLEY's own standards for concluding a positive test for Chlamydia was rendered, nor any local or nationally recognized standards for concluding a positive test for Chlamydia was rendered.

168.   The aforesaid conduct included but was not limited to;

  - failing to establish or maintain an appropriate and verifiable chain of custody of test specimens, slides, or results in the case of O.S.'s sample, and samples of other children where claims of sexual abuse had been made, either intentionally or recklessly, or as a result of inadequate training, policies, practices and procedures,

  - utilization in the VALLEY laboratory of methods of analysis not supported by any reasonable scientific standards or practices, and in direct contravention of the test equipment/material manufacturers specifications for using the culture medium used to culture the specimen(s) taken from O.S.,

  - specifically, ignoring manufacturers warnings set forth in their product inserts that come with the reagent and culture mediums, which warned that they should not be used with other manufacturer's reagents or culture mediums, which defendants HAMILTON and KAHLE admitted in the juvenile jurisdiction proceedings, that such were routinely

utilized methods and procedures, and were used specifically in the culturing of the specimen from O.S.,

-   use of swabs (used in specimen collection) that VALLEY employees and defendants herein used for culturing samples taken from O.S. and which do not conform with FDA specifications or the manufacturers specifications for use,

-   submitting to County Counsel SINGH, for use in the juvenile proceedings, pictures which allegedly depicted the exposed genitalia of O.S., but which in fact were not pictures of O.S. but included another unknown person , and which pictures were devoid of the customary time stamp and medical record stamp which would allow plaintiffs to authenticate or verify the date/time of the picture and/or the alleged subject of the photograph, and further, which photographs were taken with a camera known to VALLEY and the individually named defendants to have malfunctioned for years with regard to the time and medical number stamping process,

-   KAHLE, the person responsible for reviewing the cultured samples placed on slides of alleged sexual abuse victims, and specifically O.S. in the case of the related juvenile proceedings, proffered the test results she knew were to be used in the juvenile court proceedings to RITTER, HOYT, and unknown others, as being positive for Chlamydia, but only did so while intentionally and knowingly violating the laboratory policies of VALLEY which specified that a "positive" test for Chlamydia can only be stated to have been obtained when the culture of the sample contained five "inclusions" (markers of Chlamydia cells), and despite the fact the cultured sample did not reveal a "positive" result.

- KAHLE further was required to consult with a supervisor pursuant to VALLEY policies, if a slide does not meet the internal control number (five inclusions) of the policy, and not report the test to any person, but instead, did not advise any other person associated with the proceedings in the juvenile court, such as RITTER – to whom she reported the test results as "positive" – that she had not followed VMC policy with regard to the non-reporting of inclusions of less than five, or consultation with a supervisor before reporting.

169.   Separate and distinct from the actions of the other individually named VALLEY defendants set forth above, HAMILTON engaged in the following conduct intended to cause the parents and minor plaintiffs herein severe emotional distress, and/or conducted with reckless disregard for causing such stress and so causing same, and/or with the intention of assisting in the continued separation of the plaintiff family members herein, did engage in the following affirmative acts and/or omissions to act;

- HAMILTON called the director of the lab (Focus Labs) at which HAMILTON knew the plaintiffs (TRACY and RENEE) intended to send the cultured sample slide for their own evaluation and analysis, after plaintiffs had obtained a court order from the juvenile court for same, and affirmatively attempted and was successful in dissuading the lab director from becoming involved in the juvenile proceedings by performing the testing, warning the director that he did not "want to get involved in this one," or words to that effect,

- Although the court order specified release of the slide to a physician retained by plaintiffs named Dr. Quall, who indeed intended to use Focus Labs for re-testing of the alleged Chlamydia culture, HAMILTON did not contact Quall and advise of his having

dissuaded the lab director from becoming involved, which engendered an additional

delay in time of not less than a week, which HAMILTON knew would degrade the slide

to a further degree and make retesting unviable, thereby effectively destroying the

evidence plaintiffs needed to establish the absence of any Chlamydia infection in O.S.,

 - Subsequently, after the parents located another physician who would use another lab

to perform the retesting of the Chlamyida sample slide, HAMILTON, in direct violation

of the juvenile court order regarding the packing and shipping of the slide, did not pack

the slide as ordered for shipping, including storage in dry ice, further degrading the

fluorescent features in the cultured slide that would allow for the identification of

Chlamydia inclusions.

170.   KAHLE also claimed to have misplaced the slide during the juvenile proceedings, and

it was not produced despite two separate subpoenas for its production being served on

VALLEY.

171.   During the juvenile jurisdiction trial, KAHLE claimed that she saved the slide in an

"educational file," to use in educating other students.  She has testified under oath since that

time, there existed no such file into which she allegedly placed the slide.  Three weeks passed

with VALLEY failing and/or refusing to produce the slide pursuant to subpoena and/or court

orders of the juvenile court, again allowing for its degradation and compromise of the ability

to retest the sample or inspect the slide.

172.   KAHLE and HAMILTON knew that biological sample slides such as the one for O.S.,

would degrade more rapidly if not refrigerated, yet at no time did KAHLE or HAMILTON

refrigerate the slide.  There existed no policy at VALLEY for the preservation of such

samples, in fact, the policy was to discard such samples, regardless of their potential need for

use in a civil or criminal proceedings, leaving criminally accused individuals, and parents such as TRACY and RENEE, without any ability to have evidence generated at VALLEY, working in connection and cooperation with CPS and the Santa Clara County District Attorney's Office, ever evaluated or re-tested by defense retained experts or professionals.

173.  HAMILTON also testified in the juvenile jurisdiction proceeding to the effect that there was never any "mistake" made in the process of recording the results of biological testing samples or ensuring the accurate connection between samples and the person sampled.

174.  Sometime during 2005 HAMILTON learned of errors in the manner and method in which KAHLE was recording her testing results and began an audit of the previous test result records.  HAMILTON was aware that advising counsel for any of the parties would create a potential challenge to the juvenile court jurisdiction findings and therefore initially concealed this information and intentionally delayed the disclosure.

175.  Despite HAMILTON's knowledge that evidence which might exonerate O.S. from the proposition being proffered by SINGH and DFCS in the juvenile proceedings that O.S. had been sexually molested, and with the malicious intent of depriving the plaintiffs of this important information, which revealed not one but several errors in the recording of testing samples and results, HAMILTON did not advise any person, and eventually only advised County Counsel SINGH, after the dispositional hearing about the errors in the recording methods of KAHLE.  KAHLE had made six errors where she reported a testing result as a positive when the given test result was in fact negative for tests conducted at or about the same time O.S. biological sample was reportedly tested.

176.   HAMILTON knew that the parents and the children, plaintiffs herein, would be subjected to a disposition trial in January of 2006, at which time the placement issue (i.e. where the children would reside) was to be determined.

177.   With knowledge that there were potential problems in the recording methods at VALLEY's laboratory, and with KAHLE's conduct in that regard in particular, and that inaccurate recording methods of KAHLE, if exposed, would present difficulties for the successful prosecution of the juvenile dependency disposition proceeding against the Watson family, HAMILTON intentionally withheld the information from all concerned for nearly six months time.

178.   As a result of said conduct, plaintiffs were subjected to loss of liberty in familial relations, were subjected to an ongoing W&I 300 dependency proceeding which then stretched out for approximately one year, of which the false evidence of the alleged positive Chlamydia test was considered, and such deprivation extended for approximately one year the ability of the plaintiffs to be reunified as a family.

179.   The aforementioned actions and failures to act, was all part of a custom, practice or policy regarding the collection, testing, handling, analysis and reporting of test of biological samples in cases involving allegations of sexual abuse, and the withholding of exculpatory information to further the prosecution of the COUNTY in juvenile dependency proceedings, and in criminal proceedings.

180.   Said conduct, and said customs, practices and policies were known to, accepted, and ratified by HAMILTON, who was the Laboratory director at VALLEY, MAILHOT, who was the department chairperson for the Laboratory at VALLEY, and KERNS who was the

department Medical Director for the Children's Clinic at VALLEY; and each individual was a policy maker for the hospital.

181.   VALLEY, HAMILTON, KERNS, and MAILHOT, failed to adequately train and failed to adequately supervise subordinate laboratory personnel such as KAHLE regarding the scientific standards for handling, analysis and reporting test results to biological samples and as to ethical requirements of laboratory personnel in disclosing errors, negligence and incompetence in the laboratory.

**VALLEY/RITTER CONDUCT RE: WITHHOLDING OF EVIDENCE**

182.   Early in the juvenile dependency proceedings, the recalcitrance of COUNTY and/or VALLEY and their personnel to comply with lawful discovery propounded by counsel for the parents became immediately evident.  When initially presented with a Subpoena Ducus Tecum from counsel for RENEE, the investigator who was retained to perform service of the Subpoena, was told by a hospital representative that they simply would not accept the subpoena.

183.   Subsequently, during the proceedings in this action, it was learned by plaintiffs' counsel that in fact RITTER had made a videotape of the SART examination.  On September 16, 2008, the plaintiffs herein learned for the first time, from counsel for the COUNTY defendants, that indeed there was a video of the SART examinations performed by RITTER.

184.   The existence of this videotape was withheld from the plaintiffs during the entirety of the juvenile proceedings, and for over two years in the conduct of this proceeding.

185.   Plaintiffs are informed and believe that District Attorney WEST, County Counsel SINGH, and certainly defendants HAMILTON, RITTER, and MAILHOT, were aware of the existence of the videotape, and despite California law requiring COUNTY to "disclose any

evidence or information within petitioner's possession or control favorable to the child, parent, or guardian." [CRC 5.546]

186.   Santa Clara County Counsel Mr. Jered Goldman, speaking on behalf of VALLEY, represented to the juvenile court judge at a hearing on subpoena compliance held prior to the jurisdiction proceeding (8/22/05) in the juvenile court, that VALLEY had produced "everything" in response to the plaintiff TRACY and RENEE's lawful subpoenas, which statement was false, as noted in paragraph # 183 above.

187.   As VALLEY is an entity with a long standing, contractual, and intertwined relationship assisting in the prosecution of both juvenile dependency and criminal proceedings in Santa Clara County for the office of the District Attorney and DFCS, VALLEY is subject to the provisions of California Government Code Section 820.21.

**FRAUDULENT PROCUREMENT OF FIRST SJPD WARRANT**

188.   On or about July 15, 2005, HOYT did cause a warrant for collection of bodily fluids to issue with the statement "and if necessary with the use of reasonable force," contained therein and issued against both parents by Judge Jerome Brock.  At no time prior to seeking or executing the warrant, did HOYT pick up the phone and ask TRACY or RENEE if they might submit to such a test.

189.   HOYT made the following statements in an affidavit submitted under penalty of perjury in support of his application for the warrant, each set forth below, followed by the true, accurate, or complete circumstances surrounding the asserted fact or circumstance in the statement, which were intentionally withheld from the court or misrepresented, in order to influence the court to grant the requested warrant;

     a.  [O.S., in the MDI interview] "[L]ied about specific items that [he] knew to be true."

- HOYT had no personal knowledge of any fact of which O.S. could have lied about; everything he knew or questioned the child about was something learned about by him from others.  HOYT testified under oath after submission of the affidavit in support of the warrant, that he had no idea that O.S. was lying in the interview, had no information that O.S. was lying, and had only "suspicions."  HOYT's representation to the judge that the child lied, was made to obtain the warrant and was false.

b. [O.S., in the MDI interview] "[D]enied ever taking a bath with anyone older than nine years of age."

- This statement is completely false.  The child (twice) described looking for her father in the house, finding him in the tub, asking if she could come in the tub, then jumping in the tub with her father, making a big splash, her father's newspaper getting wet; the entire story told with large smiles and laughs.  O.S. even stated that she wanted to sit in her father's lap, but he would not let her.

- She said she had jumped in the tub with her father one time.

c. [O.S., in the MDI interview] "[D]isplayed unique non-verbal behavior during the interview."

- O.S. had been diagnosed with learning disabilities and ADHD long before the 6-30-05 MDI interview with HOYT, and HOYT had been provided a list of the child's known medical and/or psychological maladies, and did not disclose that fact.  In consideration of that fact, as compared to a normal child without ADHD (a condition marked by an inability to focus on tasks and constant movement), nothing in O.S.'s behaviors were "unique."  O.S. moved constantly throughout the

interview, including repeatedly standing up, playing with things in the room, moving about the room, pulling her chair forward and backward, playing with a toy bird. The statement that O.S. behavior was "unique," without reference to the information HOYT was well aware of which explained those behaviors, was vague, misleading, and intended to falsely represent and improperly influence the reader/judge that there was something sexual about O.S.'s behavior.

d. [O.S., in the MDI interview] "Her posture changed dramatically on the two occasions she discussed the bath. On both occasions she sat back in her chair, raised her feet to her buttocks and spread her legs as far apart as the chair would physically allow."

- O.S. discussed the "bath," pursuant to the questioning by HOYT, for not less than twenty-five minutes.  In the course of her questioning by HOYT, she assumed the same pose he describes as "dramatic" earlier in the interview when asking her about her knowledge of the difference between a truth and a lie.  It was a false statement that she raised her feet to her buttocks.  She placed her feet on the frame of the chair at the front outer corners, as far from her buttocks as they could and still be on the chair frame.  The entire time in this pose, the child was eating some form of chip or cracker that had been provided to her on a break.  The first time she formed any such pose when discussing taking the bath with her father was for no more than 8 seconds.  The second time for approximately 7 minutes she mostly maintained said pose, with occasional different movements and postures, while eating the snack.  She told HOYT they did nothing in the bath tub, they "just rested."  The child also stood and played with the chair at various times. The entire time, the child related the story with a laughing demeanor, openly

laughing at various times, and expressing no affect of fear, embarrassment, guilt,

shame, or anything else remotely related with the common indicators of a

sexually abusive event. HOYT intentionally left out this extremely relevant

information in order to influence the court to believe the child was relating a

traumatic or unusual event, when in fact, the circumstances surrounding the

child's movements and affect were entirely the opposite.

e.   [O.S., in the MDI interview] "She never disclosed any incidents of molestation."

-   HOYT intentionally misleads the court with this representation, failing to tell the

court that in fact the child expressly denied any incidents of molestation, saying in

response to HOYT's question whether anyone had ever touched her private parts,

"no."

f.   "RENEE STALKER and the attorney for TRACY WILLARD WATSON refused to

meet with a CPS social worker in order to allow CPS to complete their due diligence

and possibly return the children to [the parents]."

-   HOYT's statements was knowingly and intentionally false.  Two days prior to

swearing out the affidavit on July 15th, 2005, HOYT testified under oath in the

juvenile court proceeding on July 13th, 2005, that "the parents refused to meet

with CPS without each having their own attorney."  HOYT has testified since that

time, under oath, that he had "no information about whether or not the parents

were willing [to meet with CPS].  HOYT's intention in submitting the

misrepresentation to the court in his affidavit, was to falsely portray the parents as

completely refusing to cooperate in any investigation of the abuse of O.S., which

was not the case, in order to influence the judge to sign the warrant he was

requesting.

g.  [With regard to HOYT interview with ROSE REAL on 7-15-05] "The masturbation

disturbed [REAL] because she knew [O.S.] had not been diagnosed with a condition

that would cause that kind of uncontrollable, repetitive behavior."

-  The statement is false and/or misleading.  REAL, the very day HOYT swore out

the affidavit in support of the warrant, told HOYT that it was her understanding,

and she found in a "psych report" a reference to a neurologist having diagnosed

the child with Tourette's Syndrome, and that syndrome was causing the alleged

masturbation.  HOYT also intentionally left out the statements by REAL about

her lack of competency to address the masturbation by the child in school as

inappropriate in amount/frequency/type, based on her lack of experience with the

age group to which O.S. belonged.

h.  REAL also told HOYT that the school psychologist had expressly told her in response

to her concerns about possible sexual abuse that the psychologist pointed out that

children do masturbate, and that does not mean the child has been sexually molested.

i.  [With regard to HOYT interview with ROSE REAL on 7-15-05] "On 5-26-06, [O.S.]

disclosed to the Resource Specialist that she had recently bathed with her father."

-  This statement is false.  REAL told HOYT that when she attempted to determine

when the "bath" took place, the child responded that it was "like my age now."

There was no description from any source that O.S. had "recently" bathed with

her father, and O.S.'s description provided no remotely specific period of time.

j. HOYT represented to the court that there was a "pending criminal prosecution" of TRACY WATSON.

- This statement was false. There was no complaint filed, no indictment, no pending criminal prosecution in any court at the time the false representations were made.

k. HOYT represented that O.S. had, on May 27th, 2005, "drew a picture of she and TRACY WILLARD WATSON naked in a bathtub with their legs spread."

- This statement was false and/or misleading. HOYT had been told by REAL that when O.S. described the picture she had drawn of her and her father in the tub, that only the father's legs were spread, and that they were spread so that she could sit in the tub "in the middle."

l. HOYT omitted from the warrant information that he had no rational basis to believe that any of the conduct he observed during the interview was indicative of molest despite the fact that he was attributing it to be indicative of molest. This omission was intended to mislead the Court.

m. HOYT further did not tell the court that O.S. related that her parents had told her that if anyone ever touched her private parts she needed to tell someone, and act of protective parents, not pedophiles.

n. HOYT further did not tell the court, that in response to HOYT's statement that he was talking to O.S. because somebody told him they were afraid that something "bad" was happening to O.S., she replied, "but nothing bad happened to me, I was fine."

o.   HOYT omitted from the warrant affidavit information that following the MDI interview HOYT concluded that there was no basis to continue to detain the children;

190.   The warrant also authorized the entry into the Watson home, and the collection of the following items only, "medical records and documents related to RENEE STALKER, TRACY WILLARD WATSON, and/or JANE DOE located in the residence."

191.   In executing the warrant, HOYT took a plethora of items not specified nor authorized for seizure under the warrant, including but not limited to;

- school records of all the children, not just O.S.,

- a picture of Renee as a little girl,

- confidential juvenile court proceeding documents,

- the bathtub drawings from the court process (given to the plaintiffs herein in discovery in the juvenile matter), which bore no indicia of who had prepared them or who or what they portrayed,

- medical records, and specifically billings for Sybil Watson (which on their face were made out to her and not any of the named plaintiffs),

- copies of O.S.'s school Individualized Education Plan,

- a typed transcript of O.S.'s recorded interview with Harvey Shapiro, a professional hired by the parent plaintiffs herein, for use in the juvenile dependency proceedings, which document also contained notes from Tracy Watson on it),

- O.S.'s birth certificate and a large number of school records for O.S.,

- A document of a timeline prepared by Renee Stalker about communications with Evergreen District and her handwritten notes thereon and related thereto.

-      An attorney-client privileged communication from STALKER to her counsel Carin Johnson, which did not resemble in any fashion any document authorized for seizure under the warrant and was readily discernible as a communication between and attorney and a client.

192.   After having seized the last item listed, the attorney-client privileged communication between RENNE STALKER and her attorney, HOYT then read the document to LETONA, the social worker representing the opposing party in the juvenile dependency proceeding.

193.   In the affidavit filed in support of the warrant, HOYT intentionally misled the court, selectively failing to tell the complete and accurate truth about evidence and information he had gathered, statements made by the minor child O.S., and statements made by REAL, and did thereby procure an invalid warrant, which was used by HOYT, through other SJPD employees, to seize and conduct testing on RENEE  and TRACY, and enter the Watson family home by force, breaking down the front door of the home in the process of executing the warrant.

194.   The failure to include these facts was intentional and malicious, as was the removal of a large number of items not described by the warrant or authorized for seizure by the warrant, and all such actions, false statements, and misrepresentations were undertaken with the intent of causing TRACY and/or RENEE severe emotional distress, or with reckless disregard for the likelihood of causing them severe emotional distress, and then causing same.

**THE DETENTION, ARREST, AND INTERROGATION OF RENEE STALKER**

195.   On July 15th, 2005, SJPD plainclothes officers confronted RENEE as she finished up a court ordered visit with her children at the San Jose Children's Shelter without the above warrant in their possession.  Although RENEE asked them specifically when they confronted

her "do you have a warrant," the officers stated they did not, but that one was "coming."  She told them that "if you don't have a warrant, then I'm leaving."  They responded telling her they were not going to let her leave.  She responded that she must then be under arrest, and put out her arms for them to handcuff her.  As soon as they did, RENEE asked to speak to her attorney immediately.  They ignored her requests for information or to speak to her attorney, and put her in the back of their patrol car.

196.  After she had been left in the patrol car for 10 or 15 minutes, the "bodily samples" warrant was faxed over to the San Jose Children's Shelter, and read to RENEE while in the back seat of the car.   The warrant was not an arrest warrant.  She repeated her requests for an explanation as to why she was going to have her bodily fluids taken; the officers ignored her and refused to answer any of her questions.  They told her that they could either do this, "the easy way" or, "the hard way," telling her she could just cooperate or that they could hold her down and forcibly remove the fluids.

197.  RENEE's response was that she wasn't doing anything until she spoke to her attorney.  The response was, "Alright, well we'll do it the hard way," and they drove her to the police station.

198.  After RENEE arrived at the police station, HOYT refused to identify himself to RENEE upon her request, as she was chained to a steel table, and proceeded to interrogate her without reading her Miranda rights, nor allowing her access to an attorney despite her specific inquiries into her right to have an attorney present for questioning.  He proceeded to interrogate her for in excess of two hours, and then only at the end, allowed her to call an attorney.  Nothing in the warrant authorized this conduct or the unreasonable continued detention of RENEE.

199. Also, on July 15, 2005, BLANK, with other unidentified SJPD officers, approached the Watson residence with guns drawn, ransacked the parents two vehicles, and smashed in their front door while executing the "bodily samples" warrant described above. The warrant had also contained a provision authorizing the police to search for medical records on O.S. at the home.

200. TRACY learned of his wife's seizure shortly after it occurred, by way of a panicked phone call from the maternal grandmother, who had been present when RENEE's arrest had occurred.

201. TRACY, after his counsel spoke with the police, agreed to simply come down and submit himself for testing. Neither parent had Chlamydia, and the test results were negative.

**FRAUDULENT PROCUREMENT OF SECOND SJPD WARRANT**

202. On or about September 1, 2005, HOYT again under the guise of a claim that there was an active investigation for a violation of Penal Code section 288 involving the parents, and based on other meritless, false, and misleading information as set forth above, obtained a second warrant, this one for the purpose of acquiring the medical records of the parents, and did execute that warrant on the offices of their respective physicians.

203. Again HOYT did not apprise the court in his application for the warrant that the child had repeatedly stated she had not been abused or inappropriately touched by any person. That this had occurred despite two separate interviews conducted with inappropriate suggestive, leading and accusatory questions resorted to by HOYT out of a desperate attempt to obtain an incriminating statement supporting his ill conceived notion that O.S. had been molested by TRACY. The information was excluded from the application for the warrant for the purpose of obtaining the warrant under false pretenses.

204.  These acts were done to harass plaintiffs TRACY and RENEE and violate their civil rights, or to otherwise circumvent lawful means of obtaining evidence for the purpose of the investigation of the Welfare and Institutions 300 et seq. investigation being performed by LETONA.

205.  LETONA and HOYT maintained frequent and ongoing contact for the purposes of assisting each other in their legislatively distinct roles of investigating crime and investigating child abuse, the latter of which, requires in all but a few factual circumstances not applicable to the Watson family, the reunification of the family members.

**CHILDRENS' INITIAL FOSTER HOME PLACEMENT**

206.  After the children had been removed from their home, without regard to the family's culture, or the requirements of two special needs children plus a breast-feeding infant, the children were isolated for over 6 months in a Spanish-speaking only satellite foster home, despite the availability of placement with family members or more reasonable placement, and in contravention of California law specifying a preference for relative family member placement, and California law and Title 31 Regulations specifying placement of dependent children with families of similar culture, language, and religious practices.

207.  The placement of S.W. in such an environment, particularly with the speech delays and associated delays of his autism, and the placement of R.W., who was just learning to speak, was detrimental to the development of both children, causing both irreparable damage in their social and educational development.

**VALLEY CONSPIRACY RE: CHLAMYDIA RESULTS**

208.  On July 22, 2005, KERNS submitted an unsolicited letter to the Dependency Court falsely stating that the positive Chlamydia lab result on O.S. was "evidence of recent

infection." KERNS was not qualified to make such a statement, nor did he have sufficient information to make such a statement, and yet made such statement and sent it to the court despite knowing that he did not have sufficient information for making such a statement.

209. KERNS actions were undertaken despite the knowledge that it would cause harm to plaintiffs' herein, or with reckless disregard for the likelihood of such statements doing so.

210. Prior to the Dependency Court hearing on July 26, 2005, REAL and HARMS submitted false statements and evidence about the parents to both HOYT and LETONA in support of their initial false claims of abuse regarding O.S.

211. On or about July 26, 2005 MAILHOT submitted an unsolicited letter to the Dependency Court regarding the alleged validity of the Chlamydia testing, in an effort to support the false and inaccurate claims of her staff. At the time she submitted the letter, MAILHOT knew that the statements therein were not supported by the information available to her and that she was not qualified to make such a statement. Dr. Mailhot also knew the statement would cause damage to plaintiffs herein, or made such statements with reckless disregard for the likelihood of such statements doing so.

212. Promptly after the parents learned of the alleged positive test results, their counsel submitted subpoenas to obtain copies of the lab test results, and the alleged slide that showed the alleged Chlamydia. In response to the parent's reasonable request for not only the Chlamydia results but also O.S.'s complete chart, VALLEY refused to comply with two subpoenas. Initially in response to the subpoenas KAHLE stated the slide was destroyed. It was only after the two subpoenas, and further action with the Court that a VALLEY employee claimed to have found the slide in a drawer where she had placed it in contemplation of using it in a class as an educational tool.

213.   VALLEY, by and through KAHLE, KERNS, and HAMILTON, intentionally and/or with reckless disregard, fabricated and/or hid and/or mishandled the testing results, failed to document any chain of custody of same, and destroyed the biological samples.

**THE SECOND MDI INTERVIEW OF O.S.**

214.   On or about July 27th, 2005, the parents learned in court that the SJPD wanted to do a second MDI interview of O.S.  At that time, O.S. was represented by WEST, however, at no time did WEST object to a further MDI, as she should have; nor did WEST attend the MDI to ensure that her client was not questioned inappropriately, or set any limitations on the interview to protect her client, all such conduct by WEST was contrary to the best interests of her clients, plaintiff minors herein.

215.   Plaintiffs are informed and believe, and thereon allege, that WEST at no time consulted with any of her "clients" to ascertain their position or opinions about the conduct of a second MDI Interview of O.S. by officer HOYT.

216.   This second interview was held on July 29th, 2005, four weeks after the child was removed and has been living in the shelter for twelve days and then a Spanish speaking foster home, went on for approximately an hour and a half.

217.   HOYT became intimidating in his questioning style and his repeated attempts to get O.S. to make some accusation against her father, even going so far as to tell the child that she has a "disease," apparently referring to the Chlamydia, obtained nothing other than the child's repeated denials anyone at all had touched her inappropriately, with their penis, with a "sex bean," or with anything else, ever.

218.   The questioning of O.S. by HOYT was horrific.  He badgered her, raised his voice, displayed open incredulity at her repeated assertions of non-molestation, and asked the young

child with developmental delays the same questions over and over again.  He intimidated her, implicitly threatened her, and inferred she was lying throughout his interrogation, repeatedly telling her they were supposed to be telling only the truth in the interview.  The child told him on several occasions that she was confused, and displayed fatigue, but HOYT did not relent.

219.  Despite his efforts, the child continued to deny that her parents or anyone else had molested her in any way.  At one point in an approximately 15 minute segment of the interview, HOYT asks the child on average every 45 seconds, "Who touched you?"  O.S., raised by her parents to tell the truth at all times, tells HOYT repeatedly that no one touched her, and denied that anyone had stuck their penis inside of her or touched her vagina.

220.  Prior to the second MDI interview HOYT and LETONA had a discussion wherein they conspired to engage in the second MDI interview for the purpose of "breaking" O.S..  This conversation and intent was not disclosed to the Court when the representations were made to the Court regarding the necessity to conduct a second MDI interview.

**MEDICAL EXAMS WITHOUT PARENTS NOTICE, CONSENT, ATTENDANCE**

221.  In August of 2005, SINGH, in furtherance of the conspiracy to make the children dependents of the court and separate the family, directed RITTER to submit a letter to the court which said that because one child had been tested positive for Chlamydia, the other two children (the boys) should be tested as well.  This letter was done at the request of SINGH, who then presented it to the court without advising the court that she had requested the letter from RITTER, and thereby making it appear that RITTER had reached the conclusion that such testing was necessary on her own, on an independent medical basis.

222.  RITTER has admitted subsequently under oath, that she had no medical basis from which to infer that the boys had any STD's at all and did not expect anything to come from

the testing.  The reason given for why she did not expect anything to be found was because Chlamydia goes away on its own.  This statement was false, and made in furtherance of the conspiracy to make the children dependents of the court and continue the separation of the family, for the medical fact is that Chlamydia never goes away unless medically treated; it does not resolve on its own.

223.   Despite the fact that there had never been any allegation from any source that either of the boys had ever been molested by any person, RITTER wrote this letter at SINGH's request to support the conspiracy, without believing herself that there was any reason, as she felt that too much time had passed and that Chlamydia goes away on its own.  These painful and intrusive examinations set forth below, therefore served no purposes but to intentionally inflict severe emotional distress on R.W. and S.W., and/or were undertaken with reckless disregard for causing such emotional distress, and did cause same.

224.   The parents got court permission to be present during the SART exam for the boys to be held on October 3rd, 2005.  S.W. did not tolerate the procedure well at all, his autism causing him to literally freak out at the prospect of RITTER wanting to take his pants down to take a swab of his genitalia.

225.   In response to S.W.'s terrified reaction, RITTER volunteered that they could do an anal swab, and over S.W.'s protests did so.  WATSON and STALKER never argued her suggestion, complained about it, or stood in RITTER's way at all in conducting the swabs of the boys.  Later in the juvenile proceeding, RITTER lied under oath and stated that the parents had "interfered" with her performing the genital swabs on both boys, which lie was another overt act in furtherance of the conspiracy formed between LETONA, BURGAN,

CASTALDI, BAUM, and SINGH, to interfere in the familial association rights of the family and make the children dependents of the juvenile court.

226.   Thereafter, without any notification to the parents, obtaining their consent or arranging for either parents attendance, and with full knowledge that the court had ordered the parents could attend any such exam, RITTER and LETONA scheduled and took another swab of the boys, searching for Chlamydia on October 6th, 2005.   The test procedure that was used involved RITTER inserting a Q-tip swab one to two centimeters into the urethra of R.W. and S.W., causing them great pain.  No Chlamydia was found. Each of these testing events were investigative in nature, and not part of any routine medical examination.  While the first was court ordered, the second was not, and was done without notice to the parents or the opportunity to attend, violating both the parents and the boys rights of familial association.

227.   RITTER then lied in court saying that the parents interfered with the swabs the first time, and that was the reason that she had gone back surreptitiously, and without a court order, and obtained a second swab from the penis of each boy.

228.   The parents also learned after the fact, that LETONA had arranged for two doctor's appointments away from the Kaiser facility and regular pediatrician who served the boys, for at least two appointments between August and September of 2005.  At these appointments, the children were subjected to unnecessary blood draws, involving the insertion of needles into their bodies, as well as other unnecessary examinations.

229.   At the first a variety of procedures were conducted on both boys.  The procedure involved sticking the boys with needles and drawing blood, something which has always terrified S.W.  At the second appointment, S.W. was treated for a severe bout of bronchitis.

230.   The parents were not notified in advance of the second surreptitious taking of genital swabs of the boys, nor the appointments made at the Kaiser facility where the children did not regularly attend, thus they did not consent, nor have the opportunity to do so or seek judicial review, and were not able to attend, thus depriving both parents and the boys of the comfort of each other's presence, and violating their rights of familial association for this investigative medical testing.

**HOYT / LETONA EXCHANGE OF CONFIDENTIAL DOCUMENTS**

231.   After the jurisdictional trial in the juvenile court proceedings in November of 2005, and sometime prior to January 13th, 2006, HOYT and LETONA, in their ongoing exchange of information about the juvenile proceedings, agreed that LETONA would provide HOYT with confidential documents, including but not limited to, the transcripts of proceedings in the juvenile dependency matter involving the Watson-Stalker family.

232.   LETONA did provide such documents to HOYT, and HOYT, although apprised of the fact his access to same was unlawful through his own consultation and advisement with the Santa  Clara District Attorney Victoria Brown, did receive and review said transcripts and use same as a basis for concluding that it was appropriate for him to make a referral of both TRACY and RENEE as "suspects" in the Child Abuse Central Index maintained by the California Department of Justice.

233.   This was done with the intention of causing the adult plaintiffs herein, to suffer further severe emotional distress, as well as the shame, embarrassment, and humiliation of being placed on a database with persons who have allegedly physically or sexually abused their children, when HOYT knew, and was of the opinion himself, that there was no evidence of a crime committed by either TRACY or RENEE.

**THE CONDUCT OF YAZMINA LETONA**

234.   On or about October 17, 2005, case worker LETONA lied in the juvenile proceedings in the Superior Court, falsely claiming to have written a Master's Thesis at San Jose State University to support County Counsel's representation of her "expert credentials," and to further support LETONA's efforts to convince the court to assert jurisdiction over the children, and therefore the family.

235.   On November 29, 2005, WEST and case worker LETONA attended a scheduled appointment with O.S.'s treating Psychiatrist, Dr. Ferrari, with the express purpose of defaming and falsely representing the Watson's medical history by stating that TRACY, "could not be ruled out as a suspect because he took antibiotics in 2004", in order to damage his relationship with Kaiser care providers and influence any testimony to be provided by Dr. Ferrari.

236.   On December 7, 2005, case worker LETONA conducted abusive interviews with RENEE and TRACY, in which she continued to accuse TRACY of being a possible perpetrator, without any reasonable basis to believe that abuse had occurred or that if it had, TRACY was the perpetrator of any abuse.   The conduct of LETONA during these interviews was accusatory, threatening (including a threat to allow the Watson children to be taken out of the country for three weeks by the foster care provider), and demeaning.   The actions of LETONA in these interviews was intended to inflict upon the parents severe emotional distress, or undertaken with reckless disregard for the likelihood of causing the parents sever emotional distress, and did in fact cause same.

237.   In late December 2005, at the request of LETONA, plaintiffs TRACY and RENEE were subjected to serology testing in the hopes of uncovering some form of venereal disease, which testing was done nearly two months after the Jurisdictional Trial had been completed.

238.   On January 19, 2006, the parents were directed to a private facility used by the county for court-ordered serology tests, and were confronted by three county workers including LETONA, an unidentified social worker, and a detective, with the express purpose of intimidation and harassment.  The detective was present due to the fact that despite the mandate under California law for CPS and its social workers to reunify families, LETONA was furthering the conspiracy between her and defendants BURGAN, SINGH, WEST, BAUM, and CASTALDI, to destroy the Watson family and permanently separate the parents from the children.

239.   LETONA took a biased, disrespectful, and denigrating approach towards the adult plaintiffs at all times during her handling of the juvenile dependency proceeding.  She was the "dependency investigator" assigned by DFCS supervisor BURGAN to the matter after the children's removal, and sought in every way possible and/or within her power, to destroy the family, and to slander and defame the parents to others, in furtherance of the conspiracy aforesaid, or individually of her own accord.

240.   She willingly participated in the conspiracy to keep the children and parents from resuming any normalcy in their familial relations by way of expanded visitation, unsupervised visitation, or a return to the parents, out of her firm and unwavering and irrational conviction that TRACY had sexually abused his daughter; a conclusion reached well before the child O.S. had even been tested and allegedly found to be carrying Chlamydia.

241.  Plaintiff parents did not learn until 2007, the reason for the animus of LETONA to the Watson parents and family.  They then learned the following facts.

242.  Shortly after the removal of the children, in the beginning and through July of 2005, LETONA had decided for herself, that TRACY was a bi-sexual.  From that baseless and unfounded determination, LETONA proceeded to search for explanations of otherwise innocuous statements about family events or circumstances from young O.S., which searching included searching for information on the abuse of drugs in the "gay" community, and other research evidencing any pre-occupation with sexual matters.

243.  LETONA expressed to HOYT her sincere hopes that evidence would be produced from the testing of the parents for communicable sexual diseases (by way of the "bodily fluid samples" warrant discussed above), that would prove that one or both of the parents had sexually abused O.S.

244.  When the testing results did not provide such evidence, LETONA expressed openly to HOYT her sincere dismay that the results were not as she had "hoped."

245.  LETONA freely and repeatedly violated the confidentiality of the parents and the children that is legislated in Penal Code Section 11167.5, and Welfare & Institutions Code Section 827, telling persons not involved in or in attendance at the juvenile court proceedings, what the court had ordered, what various persons had said or argued, and the resulting court orders in the proceedings.  She shared information from confidential juvenile proceedings regularly with HOYT.

246.  LETONA also made statements to third parties not involved in the juvenile proceedings, of loathing about the parents and about the parents attorneys, attributing to the parents and/or their counsel in the juvenile proceedings, dishonesty, stupidity, and/or

ignorance, and specifically with regard to the counsel for the mother RENEE, the existence of mental and/or emotional infirmities and the inability to perform capably in her profession as a lawyer.

247.   These actions, statements, behaviors, and biases of LETONA existed during the entire pendency of the juvenile dependency proceedings, and constitute or evidence her malice and/or reckless disregard for the rights, safety, and emotional status of each plaintiff herein.

248.   On or about February 9, 2006, in furtherance of a conspiracy between LETONA, BURGAN, SINGH, WEST, and BAUM, the purpose of which conspiracy was to keep the children from reunifying with their parents based on this group of individually named defendants irrational conviction that TRACY had molested O.S., WEST sought an order requiring each of the parents and O.S. to undergo psychological evaluations.

249.   In furtherance of their conspiracy to continue the separation of the family and to attempt to prove TRACY was a pedophile who had molested his daughter, SINGH, WEST, and BAUM, sought for the court ordered psychologist Dr. Brian Abbot, to conduct as part of the psychological testing on TRACY, testing that was intended to support their firmly held belief that TRACY had pedophile tendencies and was in fact the person who had sexually abused O.S.  This conduct all took place despite the fact there had been no finding that TRACY had sexually abused O.S. in the juvenile court jurisdiction trial, and despite the juvenile court's directive that there would be no type of pedophile tendency testing or assessment on TRACY.

250.   Beginning on May 3, 2006 and ending on May 26, TRACY and RENEE were subjected to multiple sessions as part of the court-ordered psychological evaluation, in which Dr. Brian Abbott, at the request of said defendants, and despite the juvenile court having made clear at the hearing on the issue of whether any psychological testing would be performed that testing

on child sexual abuse or pedophile tendencies was not to be conducted, attempted to

administer a sexual profiling test designed for perpetrators on TRACY.  This was in clear

violation of the court order of the court that no such profile testing be permitted, and

undertaken in furtherance of the named individual defendants desire to prove TRACY was not

only a pedophile, but a pedophile who would and did molest his own daughter at the age of 8.

251.  Despite the parents' completion of the entire case plan including the submission of the

psychological report of the county selected psychologist, at or near the time of filing of the

original complaint in this action (6/29/06), COUNTY and the defendants LETONA,

BURGAN, WEST, and BAUM, continued to minimize the parents visitation and relationship

with their children and continued to refuse to return the children to their parents.

252.  In furtherance of their conspiracy, BAUM, made recommendations to the juvenile

court, that the children be made long term wards of the court, and placed in long term foster

care with relatives, despite no finding made at any time by any court that either parent had

physically, emotionally, or sexually abused any of their children.

253.  In November of 2006, the plaintiff parents learned that LETONA, BURGAN, WEST,

and BAUM, and unknown of the other defendants, were engaging in a conspiracy to keep

children from ever being returned to their parents, and to further the violation of all plaintiffs

rights of familial association.  Plaintiffs are informed and believe that SPARKS, an executive

officer of DFCS and supervisor to BURGAN and CASTALDI, knew, participated in

discussions on these efforts, and ratified each of the decision of the named defendants to

pursue this conspiracy.

254.  Plaintiffs learned that on or about October 17th, 2006, after the juvenile case had been

transferred to Napa County, BAUM was contacted by Shana Allen of the Napa County Health

and Human Services office.  Ms. Allen was a social worker with that agency who had received the Watson case as part of her case load.

255.  Upon receiving the case, Ms. Allen read the entire court file, and later admitted to the parents that what she read in the case file had led her to tears.  Ms. Allen noted that all of the service providers for the family were recommending, and had been for some time, the return of the children to their parents.  She noted that there had never been any finding that the parents had sexually (or otherwise) abused the children in any way.  In reviewing visitation notes (notes about how visits between the parents and the children were going), she saw that they were all appropriate.

256.  She wondered to herself, and expressed to BAUM during the subsequent phone call between them described below, how it was that some sixteen months after the children had been removed, the parents were still on a minimal amount of visitation with their children, and the visits were still supervised.  Under California law applicable at the time, parents were given only 12 months to reunify with their children, which was subject to a maximum of two 6 month extensions.  The parents were nearing the end of their first six month extension under California law for the receipt of "reunification services," at the time the case was transferred to Napa County and Ms. Shawna Allen.

257.  Seeking to find the answers to these vexing questions, Ms. Allen called BAUM on October 17th, 2006.

258.  Ms. Allen requested BAUM clarify why visits are still supervised, given that the parents have been appropriate during all visits and all of the service providers are in support of the minors being returned home; the parents had now been in the "system" some 16 months.

259.   In response, BAUM stated that CPS still does not know who was the perpetrator (of alleged sexual abuse on O.S.).  Ms. Allen asked how that was in any way linked to the requirement of supervised visits?  BAUM replied, "We were hoping to found out that the father was the perpetrator through the psychological evaluation."  Shocked by the reply, Ms. Allen asked BAUM to clarify, and in response she said that they (CPS) believed that the father was the perpetrator but had no proof so "they" were hoping his psychological evaluation would show this.

260.   Ms. Allen asked if it was Santa Clara County policy to continue supervised visitations in a case that over time the parents appear to be appropriate and that testing and a criminal investigation has shown that they most likely are not the perpetrators?  BAUM replied that while it normally was not, "in this case it is."

261.   BAUM told Ms. Allen that since she was very first assigned the case, she did not want the minors to reunify with their parents, and that the department was seeking to have the children ordered into long term foster care with their relative and then current placement, Pam Stalker.

262.   BAUM told Ms. Allen that she should be concerned about the parents and their "motives."  She indicated that they had "private attorneys," and had sold their house to pay for their attorneys, which was "proof" that they were not to be trusted.

263.   When Ms. Allen inquired why the autism spectrum testing that had been ordered for O.S. had never been completed, and BAUM told her that it was because CPS did not want the parents to have an "excuse" for O.S.'s masturbation behaviors.

264.   BAUM also wanted Ms. Allen to not allow the children to visit in the parents' home. When asked why, she told Ms. Allen that the police had never taken the father's computers,

and although Ms. Allen pointed out there had never been any allegations having anything to do with the father's computers, BAUM insisted that the minors should not have access to the father's computers, because "nobody knows what is on them."

265.  Either before or after the previously noted conversation, on the same date, BAUM left a message for Ms. Allen, in which she stated that she wished to speak with Ms. Allen because, "you'll get a distorted answer from anyone with the last name Stalker/Watson."  At no time in any court report, did BAUM inform the court that the reason for her recommending long term guardianship for the children was the conspiracy to continue the separation of the children from the parents based on her and her fellow conspirators belief that TRACY had molested his daughter O.S.  Nor did BAUM at any time inform the juvenile court, the adult plaintiffs herein, or their counsel in the juvenile proceedings, of her true intentions in electing not to reasonably provide the plaintiffs with progressive reunification visitation, so that she and/or her fellow conspirators could investigate further their belief that TRACY had in some way molested his own daughter.

**CONSPIRACY TO AVOID PARENTS ACCESS TO ANTI-BODY TESTING OF O.S.**

266.  WEST and SINGH made an agreement to seek an "IGG" test on the parents TRACY and RENEE.  The IGG test is designed to determine if anyone has previously suffered from Chlamydia, and could have, at the time of the juvenile proceedings, been able to detect whether O.S. or either parent had every actually been afflicted with Chlamydia.

267.  WEST and SINGH then further agreed, that in addition to seeking an IGG test for the parents, they would oppose any such IGG testing on O.S., despite the fact said test and/or the results there from, would have been significant in not only determining if O.S. had ever

actually suffered from Chlamydia, but in determining that even if she had, whether or not either of her parents had ever been afflicted with Chlamydia.

268.   WEST and SINGH were successful in achieving both of their agreed upon goals, further interfering in the ability of the parents to defend themselves from claims of sexual abuse that were implicitly, albeit not explicitly, being maintained by said attorneys and the clients of SINGH, including not only social worker defendants and DFCS, but also VALLEY and all employee-defendants thereof.

## IV.   DAMAGES

269.   As a direct and proximate result of the conduct set forth throughout this complaint, all plaintiffs have suffered severe and substantial emotional distress, mental suffering and humiliation, the anguish of which has manifested itself emotionally and physically, and continues to this day for all except R.W.  Plaintiffs O.S., S.W. and R.W. have suffered substantial developmental and academic progress deficits as a direct and proximate result of defendants' conduct as set forth throughout this complaint.

270.   Plaintiffs have suffered substantial wage lost, substantial incidental costs and medical bills already incurred, and certain to be incurred in the future.  Plaintiffs have also suffered substantial economic damage as a direct and proximate result of the defendants' conduct by way of the incursion of substantial attorney's fees to seek redress for the conduct of defendants' alleged throughout this complaint; the plaintiffs were forced to sell their family home in order to support the maintenance of legal representatives in the juvenile proceeding, and seek damages for the costs, pain, and anguish associated with the sale and move.

271.   Plaintiffs seek punitive damages from each and every of the individually named defendants in this action, whose conduct and conspiratorial acts were malicious, oppressive,

despicable, and/or conducted with reckless disregard for the pain and suffering to be inflicted upon these plaintiffs.  Plaintiffs seek an amount of punitive damages, according to proof, to punish said defendants and deter future actions of similar malevolence in the future.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### 42 U.S.C. 1983 - Entry Into Home – 4th Amendment

[Plaintiffs vs. Hoyt, Blank, Tran]

272.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim for a 4th Amendment violation against defendants HOYT, BLANK, and TRAN, for the entry into their home on June 29th, 2005.

273.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

### SECOND CLAIM FOR RELIEF

### 42 U.S.C. 1983 - Seizure of S.W. and R.W. – 4th Amendment

[S.W. and R.W. vs. Hoyt, Blank, Tran]

274.  Plaintiffs S.W. and R.W. hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim for a 4th Amendment violation against defendants HOYT, BLANK, and TRAN, for their seizure by said defendants, from their home, on June 29th, 2005.

275.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## THIRD CLAIM FOR RELIEF

### 42 U.S.C. 1983 - Seizure of O.S. –  4th Amendment

[O.S. vs. Hoyt and Thompson]

276.  Plaintiff O.S. hereby incorporates paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim for a 4th Amendment violation against defendants HOYT and THOMPSON, for their seizure of O.S. on June 30th, 2005.

277.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## FOURTH CLAIM FOR RELIEF

### 42 U.S.C. 1983 - Familial Association/ Warrantless Removal – 14th Amendment

[All Plaintiffs vs. Hoyt, Blank, Tran, Thompson]

278.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submit that the allegations therein set forth all elements necessary to support a claim for a 14th Amendment violation against defendants HOYT, BLANK, TRAN,

THOMPSON, for their seizure of the minor children and separation from their parents, in violation of their rights of freedom of association and familial association under the 14th Amendments to the U.S. Constitution, as set forth hereinabove.

279.  In removing the children R.W. and S.W., their 4th Amendment rights to be free from unreasonable search and seizure was violated, and in separating these children from the rest of their family, each member of the family's rights of familial association pursuant to the 14th Amendment were violated.

280.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

**FIFTH CLAIM FOR RELIEF**

**42 U.S.C. 1983 - Continued Detention of Children – 1st & 14th Amendment**

[All Plaintiffs vs. Letona and Burgan]

281.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim for a separate and distinct 14th Amendment violation against defendants LETONA, and BURGAN, for the continued detention of the children away from their parents and prior to the initial detention hearing in the juvenile proceedings, and violation of the plaintiffs rights of association pursuant to the 1st Amendment to the U.S. Constitution, and thereafter on the false presentation and misrepresentation of facts for a period of approximately 12 additional months.

282.  Plaintiffs are informed and believe, and thereon allege, that in obtaining court orders at the initial detention hearing, said defendants did use knowingly false and misleading statements of fact, and withheld information exculpatory to the proposition of the continued detention of the children from both parents in their allegations in the juvenile petition, and in the court reports submitted therewith, in order to obtain juvenile court approval of continued detention on the prima facie basis utilized by a California Superior Court when determining issues of the continued detention of children removed from their homes and/or parents without a warrant.

283.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

### SIXTH CLAIM FOR RELIEF

**42 U.S.C. 1983 / 1985(3) - Conspiracy Detain / Familial Association – 14th Amendment**

[All Plaintiffs vs. Sparks, Letona, Baum, Burgan, Castaldi, Singh, West]

284.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a separate and distinct claim against SPARKS, LETONA, BAUM, BURGAN, CASTALDI, SINGH, and WEST, for their involvement in a conspiracy in violation of 42 U.S.C. 1985(3), to continue the violation of the plaintiffs'14th Amendment right of familial association by the maintaining of supervised visitation beyond any reasonably necessary duration without legitimate cause and in furtherance of an intention to "prove" the commission of sexual abuse

by TRACY against his daughter O.S. despite the lack of any ruling by the juvenile court that TRACY had ever sexually abused O.S., DFCS's withdrawal of the allegation that TRACY had sexually abused his child in the court proceedings, and further in their conspiracy, intentionally refused to abide by California Welfare & Institution Code laws and legislative intent on the reunification of family members targeting on minimizing the singularly most important aspect of reunification, visitation with the parents.

285.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

**SEVENTH CLAIM FOR RELIEF**

**Unlawful Arrest, Detention, And Interrogation – 4th Amendment**

[Renee Stalker vs. Hoyt]

286.   Plaintiff RENEE STALKER hereby incorporates paragraphs 1 - 268 above, as though fully set forth at this point, and submit that the allegations therein set forth all elements necessary to support a claim for a 4th Amendment violation against defendant HOYT for the detention and interrogation of her at SJPD in excess of two hours, without counsel and in defiance of repeated requests by RENEE to contact counsel, and through the use of a warrant obtained upon false statements of fact and intentional misrepresentations and exclusions of relevant facts, intended to deceive a judicial officer, and so deceiving a judicial officer, as to obtain an unlawful warrant, which HOYT then had executed upon RENEE.

287.  RENEE specifically alleges that the warrant HOYT did obtain, whether lawfully obtained or not, only authorized a bodily fluids sample draw.  However, HOYT had RENEE arrested, then took her to jail, where he then subjected RENEE to an over two hour detention with handcuffs on, which said plaintiff contends was a violation of her 4th Amendment right to be free from unreasonable search and seizure, and/or a seizure utilizing excessive force and violating her 4th Amendment rights thereby.

288.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

### EIGHTH CLAIM FOR RELIEF

### 42 U.S.C. 1983 - Medical Evaluations & Appointments – 14th Amendment

[Tracy, Renee, S.W. and R.W. vs. Letona and Ritter]

289.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submit that the allegations therein set forth all elements necessary to support a claim for a 14th Amendment violation against defendants LETONA and RITTER for their conduct in the second investigative medical procedure and testing (bodily fluid sample draw and swabbing of the genitalia) of the minor's S.W. and R.W., without a court order, consent, or exigent circumstances excusing the obtaining of a warrant, and without notice to the parents TRACY and RENEE, thus not affording the parents the right  to object and/or be present at the performance of the procedure and testing performed on their children, or provide the comfort to the children needed during such invasive procedures.

290.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## NINTH CLAIM FOR RELIEF

### False Arrest / Imprisonment / California Const. Art. 1, Sec 13

[Renee vs. Hoyt, City]

291.  Plaintiff RENEE STALKER hereby incorporates paragraphs 1 - 268 above, as though fully set forth at this point, and submit that the allegations therein set forth all elements necessary to support a claim for unlawful arrest and/or imprisonment against defendant HOYT and his employer CITY, under California law, for the detention and interrogation of her at SJPD in excess of two hours, without counsel and in defiance of repeated requests by RENEE to contact counsel.

292.  RENEE specifically alleges that the warrant HOYT did obtain, whether lawfully obtained or not, only authorized a bodily fluids sample draw.  However, HOTY had RENEE arrested, then took her to jail, where he then subjected RENEE to an over two hour detention with handcuffs on, which said plaintiff contends was a violation of her right to be free from unlawful arrest, detention, and/or imprisonment.

293.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and

undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs

to an award of punitive damages as set forth in paragraph 271 herein above.

### TENTH CLAIM FOR RELIEF

### Unlawful Entry & Search / California Const. Art. 1, Sec 13

[All Plaintiffs vs. Hoyt, Blank, Tran]

294.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this

point, and submits that the allegations therein set forth all elements necessary to support a

claim for a violation of their rights to be free from the warrantless entry and search of their

home pursuant to the California Constitutions, Article 1, Section 13, as related to said

defendants entry into the home of plaintiffs, and search thereof, on June 29th, 2005, and

includes specifically, but not by way of limitation, the actions of HOYT in removing the

documents not described in the warrant, including but not limited to, photographs, numerous

school records, medical records unrelated to any of the children, and attorney-client privileged

communications between RENEE STALKER and her counsel in the juvenile proceedings.

295.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269

and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the

actions and inactions of the defendants named herein were malicious, oppressive, and

undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs

to an award of punitive damages as set forth in paragraph 271 herein above.

//

//

//

//

## ELEVENTH CLAIM FOR RELIEF

### Unlawful Seizure / Imprisonment / California Const. Art. 1, Sec 13

[S.W. and R.W. vs. Hoyt, Blank, Tran]

296.  Plaintiffs S.W. and R.W. hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim for a a violation of their rights to be free from the warrantless seizure of their person and removal from their home pursuant to the California Constitutions, Article 1, Section 13, as related to said defendants seizure of said plaintiffs on June 29th, 2005.

297.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## TWELFTH CLAIM FOR RELIEF

### Unlawful Search / California Const. Art. 1, Sec 13

[S.W. and R.W. vs. Letona, Ritter]

298.  Plaintiffs S.W. and R.W. hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim against defendants LETONA and RITTER for a violation of their rights to be free from the warrantless search of their person, and withdrawal of bodily fluids, pursuant to the California Constitutions, Article 1, Section 13, as related to said defendants conduct of performing medical testing and evaluations of said plaintiffs a second time (October 6th, 2005), in a manner which by its very conduct constituted actual violence upon their persons.

299.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

**THIRTEENTH CLAIM FOR RELIEF**

**Intentional Infliction Of Emotional Distress**

**Interviews Of O.S.**

[O.S. vs. Hoyt]

300.   Plaintiffs O.S. hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim against defendant HOYT for the intentional infliction of emotional distress in the context of the two MDI interviews conducted by HOYT, and including the interview performed by HOYT of O.S. while transporting her to the Shelter, which were all performed in the aggressive, demanding, accusatory manner set forth hereinabove, in direct violation of the Protocol which specified that persons with special training and expertise conduct interviews of children with special needs / disabilities, of which HOYT had neither..

301.   HOYT intended to cause O.S. severe emotional distress in the repeated questioning and badgering of this young child, and/or acted in conscious disregard and deliberate indifference to the likelihood of causing her severe emotional distress, and did in fact cause severe emotional distress to O.S.  HOYT intended to obtain statements by O.S. through coercion and duress, that could be used as testimony at trial in either the criminal or juvenile dependency

proceedings to follow, and as such is not entitled to immunity for his actions pursuant to the provisions of G.C. 820.21.

302.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendant named herein was malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

### FOURTEENTH CLAIM FOR RELIEF

### Intentional Infliction Of Emotional Distress

[Renee vs. Hoyt]

303.  Plaintiff RENEE STALKER. hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a claim against defendant HOYT for the intentional infliction of emotional distress in the context of the wrongful arrest of her person, and additionally, subjecting RENEE to over two hours of questioning and detention in handcuffs when having, at most, obtained a warrant for the obtaining of bodily fluids.

304.  HOYT intended to cause RENEE. severe emotional distress in the conduct of arresting her and detaining her in handcuffs in excess of two hours, and in the aggressive, and threatening questioning of RENEE by HOYT during the two-plus hours spent handcuffed in the SJPD offices and/or local jail facility.  In engaging in said conduct, HOYT acted in conscious disregard and deliberate indifference to the likelihood of causing RENEE severe emotional distress, and did in fact cause severe emotional distress to RENEE.

305.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

**FIFTEENTH CLAIM FOR RELIEF**

**Intentional Infliction Of Emotional Distress**

[All Plaintiffs vs. Letona, Baum, Burgan, Castaldi, Singh, West]

306.  Plaintiffs hereby incorporate paragraphs 1 - 268 above, as though fully set forth at this point, and submits that the allegations therein set forth all elements necessary to support a separate and distinct claim against LETONA, BAUM, BURGAN, CASTALDI, SINGH, and WEST, for the intentional infliction of emotional distress related to the conspiracy of said defendants to disrupt the familial association rights of these plaintiffs and continue the violation of and interference with the plaintiffs' 14th Amendment rights of familial association., by the maintaining of supervised visitation and disregard of the plaintiff parents compliance with all case plan objectives, which interference with the plaintiffs familial association was without legitimate cause and in furtherance of the defendants intention to "prove" the commission of sexual abuse by Tracy Watson against his daughter O.S. despite the lack of any ruling by the juvenile court that Mr. Watson had ever sexually abused O.S., and DFCS's withdrawal of that claim, at least formally, on an Amended Petition submitted to the juvenile court prior to the juvenile court's ruling on jurisdiction.

307.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the

actions and inactions of the defendants named herein were malicious, oppressive, and

undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs

to an award of punitive damages as set forth in paragraph 271 herein above.

### SIXTEENTH CLAIM FOR RELIEF

### Legal Malpractice

[O.S., S.W., R.W., vs. West]

308.   Plaintiffs O.S., S.W., and R.W., hereby incorporate paragraphs 1 - 268 above, as

though fully set forth at this point, and submits that the allegations therein set forth all

elements necessary to support a separate and distinct claim against WEST for legal

malpractice in the handling of their case in the juvenile dependency matter in Santa Clara

County Superior Court.

309.   WEST, pursuant to a policy, custom and practice of the Santa Clara County District

Attorney's Office undertook representation of the minor plaintiffs in this case despite a direct

conflict in that the Santa Clara County District Attorney's Office was acting in concert with

the City of SJPD Department as part of the prosecution team for the purpose of investigating

potential criminal charges against Watson and/or Stalker for conduct related to the claims that

led to the Welfare and Institutions code section 300 dependency proceeding herein.

310.   WEST further failed to object to the detention of the minor children at the initial

detention hearing, a practice which is either the written policy, or unwritten practice or

custom of all such District Attorney's similarly situated as WEST, who routinely and as a

matter of course, with no independent investigation of any kind, submit to the

recommendation of DFCS that children be detained from their parents.

311.  Given this practice and/or policy, and the inherent conflict of interest in the District Attorney's Office representing minor children while simultaneously investigating and prosecuting criminal action against one or both parents of such children, the policies and practices of the Santa Clara County District Attorney's Office constitutes deliberate indifference to the familial association rights of minor children.

312.  WEST failed to take any reasonable action to investigate the false claims of abuse made and failed at any time to consider or reasonably investigate the possibility that such claims may in fact be false and the child O.S. was never abused, as O.S. had stated adamantly to HOYT approximately two dozen times during her second taped interview conducted by HOYT.

313.  WEST failed to take any reasonable action to investigate the appropriateness of the placement and supervision of the minor children; failed to take any reasonable action to insure that the children's special needs were being met by their placement and supervision; failed to take any reasonable action to protect the minor children from injury or damage as a result of their placement in foster care; engaged in joint efforts with County Counsel, SJPD Department and DFCS to thwart the reunification of plaintiffs as a family without any reasonable basis for doing so in violation of her duty of impartiality and ethical responsibility to her client.

314.  WEST failed to perform her duties consistent with the standard of care for an attorney representing minors in a W&I 300 proceeding, and failed to communicate with her clients in an accurate or timely manner, and instead represented the interest of the Santa Clara County District Attorney's Office, DFCS, and the other Santa Clara County entities without having any understanding of the needs and desires of her clients.

315.  WEST has violated at least the following rules of professional conduct during the course of her representation of the minors herein:  Rule 1-100; 3-110; 3-200; 3-310; 3-500;

316.  Throughout the pendency of the juvenile court matter WEST engaged in administrative and investigative activity outside the ordinary scope of litigation for the purposes of thwarting efforts of the plaintiffs to reunify as a family. Such activity included but was not limited to meeting with witnesses and/or adverse parties to her clients in an effort to formulate the adverse party's case against reunification of the family, and the witnesses' testimony in a fashion adverse to her client's familial association rights with their parents, all of which was directly contrary to the minor children's expressed desire repeated throughout the dependency proceedings that they be returned to their home and their parents.

317.  Further WEST did engage in efforts in such meetings with witnesses prior to the juvenile jurisdiction trial, to suppress evidence from disclosure to plaintiffs WATSON and STALKER, in conspiracy with the other individually named defendants social workers and their supervisors herein.

318.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

//

//

//

**SEVENTEENTH CLAIM FOR RELIEF**

**Discriminatory Violation Of The A.D.A. And Section 504 Of The Rehabilitation Act**

[Tracy, Renee & O.S. vs. Real , Pruitt, Blodgett, Kishimoto, and Harms]

319.  Plaintiffs WATSON, STALKER, and O.S., hereby incorporate the allegations set forth in paragraphs 1 - 268 above, as if set forth fully herein, as such allegations relate to the violation of said plaintiffs rights under the American With Disabilities Act and Section 504 of the Rehabilitation Act by defendants REAL , PRUITT, BLODGETT, KISHIMOTO, and HARMS.

320.  Defendants REAL and HARMS, with the ratification and consent of PRUITT, did engage in discriminatory conduct directed at O.S. with full knowledge of the fact that Plaintiff O.S. is disabled, and a "qualified" individual pursuant to the American with Disabilities Act, by engaging in a series of acts beginning in 2003 and continuing thereafter until at least October of 2005, as described herein above.

321.  REAL and HARMS did personally, and directed others, to question the validity of O.S.'s disability and special needs without any reasonable basis for challenging the validity of her disability and special needs, and withheld appropriate referrals for investigation and evaluation of her disability and special needs as set forth herein above.

322.  This conduct included the aforementioned conduct, but was not limited to, verbally berating O.S. in front of other pupils for her involuntary masturbatory conduct caused by her disability, which included loudly telling the child to stop touching herself, and keep her hands on the desk, while in a classroom full with other students, failing and/or refusing to make appropriate referrals for psycho educational testing and evaluation.

323.  Additionally, REAL and HARMS took advantage of O.S.'s disability and resulting vulnerability to try to influence and suggest to her unlawful and despicable and fabricated sexual conduct by her father against her, in an effort to have the child adopt the fabricated sexual conduct as having actually occurred.

324.  With knowledge of her disability and despite a duty to provide O.S. with accommodations at the School, defendants intentionally and maliciously refused to provide any accommodation for O.S.'s disability, but rather sought to interfere with her daily activities by conducting CPS investigations, and "shaming" O.S. into compliance with their behavioral requirements.

325.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## EIGHTEENTH CLAIM FOR RELIEF

### Intentional Infliction Of Emotional Distress

[O.S. vs. Real and Harms]

326.  Plaintiff O.S., hereby incorporates the allegations set forth in paragraphs 1 - 268 above, as if set forth fully at this point, and submits that the allegations therein set forth all elements necessary to support a claim against defendants REAL and HARMS for the intentional infliction of emotional distress in the context of the behaviors and statements made to the child openly in a class of her peers, and intended to cause O.S. emotional distress sufficient to stop engaging in the allegedly masturbatory behaviors, as specifically set forth herein above.

327.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

### NINETEENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

[O.S., R.W., S.W vs. Sparks, Letona, Baum, Burgan, Castaldi, Singh, West]

328.  Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 - 268 above, as if set forth fully at this point, and submits that the allegations therein set forth all elements necessary to support a claim against defendants SPARKS, LETONA, BAUM, BURGAN, CASTALDI, SINGH, and WEST for the intentional infliction of emotional distress in the context of the placement and continued retention of the children in a primarily Spanish speaking home, which conduct was undertaken with the intention to inflict emotional distress on the children, or with reckless disregard of the likelihood of causing the plaintiff children severe emotional distress.

329.  Defendants were statutorily responsible for the supervision of placement of the minor plaintiffs during the pendency of juvenile proceedings while occurring in Santa Clara County, and it was LETONA, with the confirmation and ratification of SPARKS, and BURGAN, who placed the children in the primarily Spanish speaking foster home, BAUM and CASTALDI continuing said placement even after being advised of the deleterious effect such placement had and/or was having on the speech development of S.W. and academic development of O.S.

330.  DFCS, by and through LETONA and BURGAN, owed statutory duties to the plaintiffs to exercise care in the supervision of the children's placement.  Additionally because the DFCS took custody and control of the minor plaintiffs they owe a general duty of care to the plaintiffs for the reasonable supervision of their placement.

331.  The children were placed and detained in emergency foster placement for several months without any reasonable efforts for more stable placement in violation of statutes mandating stable placement in families and/or foster homes similar in language and culture to the families of the children removed, and specifying a preference to family relatives.

332.  Plaintiffs are informed and believe that attorneys SINGH and WEST participated in the conspiracy to ignore the rights of the minor plaintiffs in their placement, and the obligations for a safe, stable, and culturally similar placement.

333.  By engaging in the aforementioned conspiracy, and in furtherance thereof, LETONA, BAUM, BURGAN, and CASTALDI, violated at least the following statutes: California Welfare and Institutions Code sections 300.2; 302; 305; 309; 319; 329; 361.3, 396.

334.  In addition to the conduct described above, defendants LETONA, BAUM, and CASTALDI intentionally reported fabricated statements and conduct regarding interaction between the plaintiffs during the course of visitation, making misrepresented facts and misrepresenting the significance of interactions between the parents and the children – such as characterizing innocuous displays of affection as sexual or inappropriate - with the intent to cause further suffering by the family by thwarting the efforts of the family to reunify.

335.  In submitting such false and misleading statements to the juvenile court, LETONA, BAUM, and CASTALDI forfeited immunity pursuant to G.C. 820.21, as their actions were

malicious and/or undertaken in reckless disregard of the rights and safety of the parents and children.

336.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## TWENTIETH CLAIM FOR RELIEF

### 42 U.S.C. 1983 - Violation of Rights of Familial Association

[Plaintiffs vs. Singh, West, Hamilton, Noble, Kahle, Kerns, Mailhot, Valley]

337.   Plaintiffs hereby incorporate the entire allegations set forth in paragraphs 1 - 268 above, as if fully set forth herein, as those allegations relate to a cause of action against defendants WEST, HAMILTON, MAILHOT, RITTER, KERNS, and KAHLE, and also as against VALLEY on the *Monell* theory of municipal / entity liability, for the continuing violation of the plaintiffs rights of familial association pursuant to the 14th Amendment, as occasioned by the affirmative acts and omissions set forth hereinabove, which plaintiffs additionally allege were all part of a larger conspiracy with the COUNTY employee defendants of DFCS, and defendants WEST and SINGH, to continue the interference of the COUNTY with the plaintiffs familial association, and reunification as a family, and/or part of a larger failure and deliberate indifference of the policies, practices, procedures, and inadequate training of VALLEY and VALLEY employees such as the individual VALLEY employee-defendants herein.

338.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

## TWENTY FIRST CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

[Plaintiffs vs. Hamilton, Kahle, Rittter, Valley]

339.   Plaintiffs hereby incorporate the entire allegations set forth in paragraphs 1 - 268 above, as if fully set forth herein, as those allegations relate to a cause of action against defendants HAMILTON, KAHLE, RITTER, and also VALLEY pursuant to the principles of respondeat superior, for intentional infliction of emotional distress.

340.   In undertaking the actions and committing the omissions aforesaid, these named individual defendants did seek to intentionally cause the plaintiffs severe emotional distress, and/or acted in reckless disregard for the likelihood of causing the plaintiffs severe emotional distress, and did cause severe emotional distress to plaintiffs.

341.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

**TWENTY SECOND CLAIM FOR RELIEF**

**Negligence**

[Plaintiffs vs. Hamilton, Kahle, Ritter, Valley]

342.  Plaintiffs hereby incorporate the entire allegations set forth in paragraphs 1 - 268 above, as if fully set forth herein, as those allegations relate to a cause of action against defendants HAMILTON, KAHLE, and RITTER, and VALLEY pursuant to the principles of respondeat superior, for negligence.

343.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.

**TWENTY THIRD CLAIM FOR RELIEF**

**TITLE 42 USCS SECTION 1983, 1986 – CORRUPTION OF COURT PROCESS**

**AND CONSPIRACY TO DEPRIVE SUBSTANTIVE DUE PROCESS RIGHTS**

[Plaintiffs vs. Pruitt, Blodgett, Kishimoto, Harms, Real, West, Sparks, Singh, Ramirez, Burgan, Castaldi, Letona, Baum, Hamilton, Kahle, Mailhot, Ritter]

344.  Plaintiffs hereby incorporates the entire allegations set forth in paragraphs 1 - 268 above, as if set forth fully herein, as said allegations relate to a cause of action pursuant to 42 U.S.C. 1986, in that defendants PRUITT, BLODGETT, KISHIMOTO, HARMS, REAL, WEST, SPARKS, SINGH, RAMIREZ, BURGAN, CASTALDI, LETONA, BAUM, HAMILTON, KAHLE, MAILHOT, and RITTER had knowledge of the wrongs conspired to be done, and mentioned in 42 USCS § 1985, or that they were about to be committed, and had the power to prevent or aid in preventing the commission of the same, yet neglected or refused to do so.

345.  At all times relevant herein, Defendants have acted in concert with one another at various times throughout the last year to deprive plaintiffs of their constitutional rights and liberty interest in maintenance of family relations, custody, control and supervision by the parents of their children and have otherwise set out to continue depriving them of contact with one another.

346.  In Santa Clara County the divisions of the COUNTY government have established a method of operation relative to each division's involvement with "child protective services" and cases originating in the juvenile or criminal systems and involving possible abuse or neglect of children.  The methods of operations are one of convenience to the respective agencies employees and supervisors as opposed to the rights and protections to be afforded to the persons that are subjected to the jurisdiction of the agencies.

347.  The governmental agencies are lax in their standards and are essentially unchecked in the juvenile court system due to the united front they present to the court when called upon to present their case, and the unlawful, and sometimes in direct contravention of court order styled behavior in the next cause of action, which is routine.

348.  In this case the defendants manipulated the court and judicial system through misrepresentation, destruction of evidence, interference in obtaining compliance with lawful court orders made to provide the plaintiff parents the opportunity to fully present their juvenile court case, and concealment, in order the use the power of the Court to unknowingly carry out their unlawful, unjustified and malicious scheme against this family and others.

349.  The result of this method of operation is total disregard for the constitutional rights of persons such as plaintiffs herein in an effort to maintain that method of operation, and to obtain criminal convictions and/or juvenile court jurisdiction over families.

350.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.  Plaintiffs further allege that the actions and inactions of the defendants named herein were malicious, oppressive, and undertaken with reckless disregard for the rights and safety of the plaintiffs, entitling plaintiffs to an award of punitive damages as set forth in paragraph 271 herein above.

### TWENTY FOURTH CLAIM FOR RELIEF

### INVASION OF PRIVACY – 1st Amendment

[Plaintiffs vs. LETONA and HOYT]

351.  Plaintiffs hereby incorporates the entire allegations set forth in paragraphs 1 - 268 above, as if set forth fully herein, as said allegations relate to a cause of action pursuant for a violation of the plaintiffs constitutional right of privacy pursuant to the 1st Amendment of the U.S. Constitution, as occasioned by the providing of juvenile court hearing transcripts by LETONA to HOYT, as described herein above.

352.  At not time did any plaintiff consent to the provision of said confidential records to HOYT.

353.  The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.

### TWENTY FIFTH CLAIM FOR RELIEF

### INVASION OF PRIVACY / STATUTORY CONFIDENTIALITY VIOLATION

[Plaintiffs vs. LETONA and HOYT]

354.  Plaintiffs hereby incorporates the entire allegations set forth in paragraphs 1 - 268 above, as if set forth fully herein, as said allegations relate to a cause of action pursuant for a violation of the plaintiffs rights of privacy and confidentiality in juvenile court proceedings

related to the providing of juvenile court hearing transcripts by LETONA to HOYT, as described herein above, and as such privacy rights and confidentiality rights are conferred on plaintiffs pursuant to California law, to wit, Welfare & Institutions Code Section 827 and California Rules of Court 5.552 (CRC 1423 at the time of the events complained of herein).

355.   The plaintiffs to this claim for relief, re-allege the damage allegations of paragraphs 269 and 270 for the violations of their rights as stated herein.

## TWENTY SIXTH CLAIM FOR RELIEF

## *MONELL* RELATED CLAIMS

[Plaintiffs vs. CITY]

356.   Plaintiffs hereby incorporate the entire allegations set forth in paragraphs 1-268 above, as if set forth fully herein, as said allegations relate to a claim for relief against CITY on the liability theories set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  Plaintiffs allege that the policies, practices, and/or procedures of the CITY, as determined and effected by the individual defendants and other police officers of SJPD against Plaintiffs, constitute and/or engender a circumstance and/or environment of deliberate indifference to the rights and safety of citizens of the community. The entities CITY and SJPD are referred to interchangeably herein as CITY.

357.   At all relevant times herein, CITY established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies") which policies were a moving force in the violation of Plaintiffs' constitutional rights complained of hereinabove. Those policies, practices, and procedures include but are not limited to:

a.  The policies, practices, and procedures CITY of detaining and/or removing children from their parents without exigent circumstances (imminent danger of serious bodily injury), warrant and/or consent of their parents;

b.  The entry into a home without exigent circumstances (imminent danger of serious bodily injury), warrant and/or consent;

c.  Additionally, the CITY had non-existent and/or inadequate training, and/or failed to train their respective officers, agents and employees on the Constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to the investigation of child abuse and neglect.

d.  CITY had duties to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices, and/or provide training which confirms and provides for the protections guaranteed to Plaintiffs under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, failing to use reasonable care to select, supervise, train, control and review the activities of all agents, officers, and employees in their employ, including within SJPD; and further, to refrain from acting with deliberate indifference to the Constitutional rights of Plaintiffs herein so as to not cause Plaintiffs the injuries and damages alleged herein.

358.  Defendant CITY knew, or should have known, that by breaching the aforesaid duties and obligations that it was foreseeable that it would, and did, cause Plaintiffs to be injured and damaged by the wrongful policies and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their respective legal duties and

obligations to Plaintiffs, and constitute deliberate indifference to the rights of individuals such as Plaintiffs and others similarly situated.

359.   Defendant CITY also provided inadequate and/or non-existent training, including but not limited to, 1.) training on the Fourth and Fourteenth Amendments as same apply in the context of a child abuse investigation that may involve entry into the home and the removal of children from their parent(s), 2.) the existence and/or use of protective custody warrants provided for under California law, 3.) the emotional trauma and psychological damage to a child from removal, 4.) the clearly established law of this federal circuit on the issues of warrantless removals, exigency, least intrusive means, and the proper investigation before removal of a child.

360.   Plaintiffs re-allege the damage allegations of paragraphs 269 and 270 as said damages relate to a claim of relief for a violation of Plaintiffs' civil rights as stated.

361.   These actions, or inactions, of CITY are the legal cause of injuries to Plaintiffs as alleged herein, and as a result thereto, Plaintiffs have sustained general and special damages, as well as incurring attorney fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

**WHEREFORE, plaintiffs respectfully requests that this Court**:

1.)   Award to plaintiffs general, special and compensatory damages in an amount to be proven at trial.

2.)   Award to plaintiffs' punitive damages against all individual defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the plaintiffs, pursuant to any provision of California state or United States federal law or statutes authorizing such punitive damages.

3.) Award to plaintiffs statutory damages and/or attorney fees against all defendants as allowed pursuant to 42 U.S.C. §1988 and C.C.P. §1021.5.

4.) Grant plaintiffs such other and further relief as the Court may deem just and proper.


DATE: March 18, 2011                    ___./S/ Peter Johnson_____
                                        Peter Johnson, Esq.
                                        Attorney for Plaintiffs

DATE: March 18, 2011                    ___./S/ Robert R. Powell_____
                                        Robert Powell, Esq.
                                        Attorney for Plaintiffs


### DEMAND FOR JURY TRIAL

Plaintiffs demand jury trial per Rule 38(a) of the Federal Rules of Civil Procedure.


DATE: March 18, 2011                    ___./S/ Peter Johnson_____
                                        Peter Johnson, Esq.
                                        Attorney for Plaintiffs

DATE: March 18, 2011                    ___./S/ Robert R. Powell_____
                                        Robert Powell, Esq.
                                        Attorney for Plaintiffs